[Civ. No. 52344. First Dist., Div. Three. June 8, 1983.]

KATHRYN SHEFFIELD et al., Plaintiffs and Appellants, v.
ELI LILLY AND COMPANY et al., Defendants and Respondents.

584

## COUNSEL

Justs N. Karlsons, James W. Henderson, Jr., Russell Leibson and Carroll, Burdick & McDonough for Plaintiffs and Appellants.

Gudmundson, Siggins & Stone, W. W. Gudmundson, Paula M. Weaver, Gilmore F. Diekmann, Jr., Peter B. Logan, Bronson, Bronson & McKinnon, J. Jay Schnack, Moore, Clifford, Wolfe, Larson & Trutner, Berry & Berry, Richard J. Heafey, Peter W. Davis, James M. Wood and Crosby, Heafey, Roach & May for Defendants and Respondents.

## OPINION

SIMS, J.*—Plaintiffs, daughter and mother, have appealed from separate judgments entered in favor of five pharmaceutical manufacturers after the court granted the latter's motions for summary judgment.

On October 20, 1975, plaintiffs filed their complaint seeking special, general and punitive damages for permanent disability suffered by plaintiff daughter, allegedly proximately resulting from injection with defective Salk vaccine in the fall of 1956 and spring of 1957 when she was a school girl in Indiana. The complaint, as amended November 20, 1975, set forth causes of action sounding in strict liability, negligence, fraudulent concealment and

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

breach of express and implied warranties with regard to the manufacture, production, distribution, sale, testing, storing, inspecting and injecting of Salk antipolio vaccine. A supplemental complaint filed October 7, 1976, alleges that the defendants acted intentionally, wilfully and maliciously with conscious disregard for the safety, health and rights of the plaintiffs and the general public. The defendants represent all of the manufacturers authorized to and actually engaged in the manufacture, production and sale of the vaccine at the time of the daughter's inoculation.[1] Concededly despite exhaustive discovery it has been impossible to identify the manufacturer of the vaccine, defective or not,[2] that was administered at the time and place that the plaintiff daughter allegedly was inoculated.

Each motion for summary judgment was made on the grounds that the plaintiffs had failed to produce competent evidence to establish the identity of the specific manufacturer of the injury-causing product, and that therefore the action had no merit, there was no credible issue of fact and the complaint failed to state a cause of action as a matter of law.

On appeal the plaintiffs contend that the trial court erred in granting the motions because there is a triable issue of fact under the market share basis of liability expounded in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], certiorari denied 449 U.S. 912 [66 L.Ed.2d 140, 101 S.Ct. 286], and under an "enterprise," or more accurately, "industry-wide" liability theory. (See *Hall* v. *E. I. Du Pont De Nemours & Co., Inc.* (E.D.N.Y. 1972) 345 F.Supp. 353, and Comment, *DES and a Proposed Theory of Enterprise Liability* (1978) 46 Fordham L.Rev. 963 (hereafter Fordham Comment).) They assert that under the foregoing precedents the burden was on each defendant to establish as a matter of law that it had no involvement in the manufacture or distribution of the vaccine causing plaintiff's injury. When faced with the argument that the foregoing rules only applied to a market or enterprise in which all the participants were manufacturers or distributors of a defective product, the plaintiffs in their closing brief suggest that the defendants have

---

[1]Although Cutter Laboratories, a corporation, was originally named as a defendant, it was dismissed when it appeared that it had ceased to produce Salk antipolio vaccine prior to the time of the daughter's inoculation, and no longer had its product on the market.

[2]The defendants have all denied the allegations that the administered vaccine was defective and unsafe for the use for which it was intended, and that it was contaminated, adulterated, impure and deleterious, and also each denied the further allegations that the vaccine administered caused the polio, encephalitis and/or other serious paralytic disease which the plaintiff daughter allegedly suffered. They denied plaintiffs' allegations concerning their late discovery of the cause of the injuries and have each pled the statute of limitations and laches. Nevertheless, issue was not joined on those matters in connection with the motions for summary judgment. For the purpose of these proceedings the plaintiffs' allegations are deemed established.

failed to show that they did not act in concert so that all would be responsible if the vaccine was improperly prepared or marketed by one, and all would be responsible for failure to give a proper warning.

We conclude that the record in this case demonstrates that plaintiffs are not entitled to shift the burden of proof to manufacturers of nondefective vaccine, and that the trial court properly granted the defendants' motions for summary judgment. The judgments must be affirmed.

### Introduction

The facts are gleaned from the almost 2,000-page record of pleadings, admissions, interrogatories and answers thereto, extracts from depositions, declarations and motions as the same have been referred to in the parties' presentations before this court. Those served and appearing as defendants and respondents are Eli Lilly and Company (hereafter Lilly), Parke Davis & Company (Parke Davis), Dow Chemical Company, as successor to Pitman Moore Division of Allied Laboratories, Inc. (Dow), Wyeth Laboratories Division of American Home Products Corporation and American Home Products Corporation (collectively Wyeth), and Merck and Company, Inc., through its Sharpe and Dohme Division (Merck).

Following the establishment of issues by the pleadings and some discovery, defendant Lilly on June 8, 1979, filed its motion for summary judgment. The other defendants each joined in seeking similar relief. Plaintiffs filed their opposition to the motions in which they claimed that the motion was premature because they were making substantial progress in identifying the culpable manufacturer, needed time for further discovery, and sought delay pending determination of the *Sindell* case that had been granted a hearing in the Supreme Court. Following a hearing on June 25, 1979, the court ordered that the motion be denied without prejudice to renewal 120 days after the date of the order.

On October 25, 1979, Lilly again filed a second motion for summary judgment. Wyeth and Merck joined in this motion, and Merck also filed independently. The plaintiffs filed extensive opposition, opposing the motion on its merits, and again sought a delay for further discovery and because of pending undetermined litigation. The records filed in connection with the earlier motion were incorporated by reference. On November 9, 1979, the court continued the pending motions to January 11, 1980.

A month later, on December 14, 1979, the plaintiffs applied for a commission to take depositions in Indiana. Lilly filed opposition on the grounds that the plaintiffs had sought a delay in June to take depositions and had not

promptly moved to do so. On December 20, 1979, the court denied plaintiffs' application as to those employees of Lilly who had been mentioned as prospective deponents in the June proceedings, and granted the commission with respect to the other witnesses.

On December 26, 1979, Dow joined in the motion for summary judgment.

On December 27, 1979, the plaintiffs filed their notice of motion for leave to file an amendment to their complaint to assert additional causes of action against the defendants on theories of enterprise liability, concert of action and market share, similar to those set forth in the then pending *Sindell* case.

On January 11, 1980, after the plaintiffs, Lilly and Merck had filed other voluminous documents in support of their respective positions, the motions came on for hearing. The court granted the plaintiffs' motions to file amendments to their complaint, and granted the pending motions for summary judgment. Subsequently, a similar motion for summary judgment was interposed by Parke Davis and was granted. It was stipulated that the appeals from the respective judgments entered for the defendants be consolidated in these proceedings.

### The Facts

In March 1953, Dr. Jonas Salk announced the development of a vaccine for poliomyelitis. Thereafter, the National Foundation for Infantile Paralysis, a nonprofit organization which had funded extensive research culminating in Dr. Salk's discovery, invited a number of manufacturers of biologicals to produce vaccine for a series of field trials designed to ascertain whether the vaccine was safe and effective. Six drug companies expressed a willingness to undertake production—Merck, through its Sharp and Dohme division, Lilly, Parke Davis and the Pitman Moore Division of Allied Laboratories, Inc., predecessor in interest to Dow, American Home Products Corporation, through its Wyeth Laboratories subsidiary, and Cutter Laboratories. Testing proceeded in 1954 and 1955 under the auspices of the foundation.

On April 12, 1955, Dr. Thomas Francis of the University of Michigan reported that Salk vaccine had proved to be both safe and effective, and the Secretary of the United States Department of Health, Education and Welfare (HEW) immediately licensed the manufacturers to commence commercial production and distribution of the vaccine.

Between July 1955 and August 1956, the vaccine was allocated among the states under a voluntary system administered by the United States Public

Health Service. Thereafter, vaccine could be purchased from the five manufacturers through each manufacturer's independent sales and distribution system. Purchases of vaccine by state governmental entities were financed in part by the federal government through the Poliomyelitis Vaccination Assistance Act of 1955.[3]

Salk vaccine was produced in accordance with the minimum requirements promulgated by HEW. Although live poliomyelitis virus was used in the production of vaccine, the infectivity potential of the virus was to be destroyed during the manufacturing process. If the vaccine were improperly processed so that the live poliomyelitis virus was not destroyed, the vaccine could actually result in the introduction of live virus thus causing the very disease against which the immunization was directed. (See *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602, 605 [6 Cal.Rptr. 320, 79 A.L.R.2d 290].)[4] All vaccine lots produced were required to be tested in accordance with the minimum requirements. Additionally, sample and test protocols were submitted to the Division of Biologic Standards of the National Institute of Health, which authorized the release of each lot prior to distribution by the manufacturer.

In October 1956, plaintiff Kathryn Sheffield, who was born June 16, 1947, the daughter of plaintiff Mary Moorman, was a fourth grade student at Saint Andrews Parochial School in Richmond, Indiana. She participated in a voluntary polio inoculation program conducted by the Wayne County Health Department and received her first inoculation just prior to October 31. She received her second inoculation on or about February 14, 1957. Several months later, on May 14, 1957, Kathryn first began experiencing the symp-

---

[3]Poliomyelitis Vaccination Assistance Act of 1955 (Act of Aug. 12, 1955, ch. 863, § 1-10, 69 Stat. 704). This legislation, which was enacted on August 12, 1955, and expired on June 30, 1957, empowered the Surgeon General of the United States to allocate to the states and territories vaccine which had been purchased with federal funds as well as to reimburse state agencies for vaccine purchased directly from the manufacturers. According to Andrew C. Offutt, M.D., former Indiana State Health Commissioner, the state was required to maintain detailed records of vaccine purchases and to forward copies of the records to the federal government upon request.

[4]The plaintiffs contend that if the vaccine contained impurities and foreign substances, the inoculation could result in the recipient becoming afflicted with encephalitis and other neurological and muscular disorders. The reference for that statement, a report of the American Medical Association Council on Pharmacy and Chemistry sent to Davis' predecessor on June 26, 1956 reads: "Consideration also has been given to the potential dangers of sensitization to antibiotics, Rh factors, kidney cells, and animal serum, and to the possibility of corresponding allergic reactions, toxic reactions, and neurological sequelae such as demyelination encephalomyelitis. Thus far these hazards appear to be minor or practically nonexistent in the light of currently available evidence. Experience so far also has indicated that there is little or no possibility of a provocative effect from inoculation with poliomyelitis vaccine. This is in contrast to the known provocative effect of inoculations of agents such as diptheria toxoid during a poliomyelitis season."

toms of the physical disorder which is the basis of the lawsuit and she was seen by Dr. Sage. On May 23, 1957, she was hospitalized at St. Vincent's Hospital, Indianapolis, Indiana with a neurological and muscular disorder which was diagnosed as encephalitis[5] and which left her with a permanent disability. At the time of the commencement of this action plaintiffs had no information regarding the identity of the manufacturer of the vaccine that Kathryn received. During the course of this lawsuit, they have undertaken extensive efforts in an attempt to ascertain the identity of the manufacturer of that vaccine. In addition to the discovery that is reflected in the record, plaintiffs have contacted numerous individuals and entities at the local, state and federal level, as well as in the private sector, with respect to this issue. These efforts have proved fruitless. Kathryn's school maintained no records of the inoculation program, nor did the Wayne County Board of Health maintain any records regarding the vaccine used in this program. Plaintiffs even attempted to contact by letter Kathryn's classmates to ascertain if they had any information regarding the identity of the vaccine administered. Despite these efforts, plaintiffs were unable to obtain any information which indicated the manufacturer of the vaccine administered to Kathryn.

Salk polio vaccine was administered on a nationwide basis to school children during 1956 and 1957. Dr. Andrew C. Offutt was the State Health Commissioner for the Indiana State Board of Health from 1954 to 1973. The state board of health was responsible for the purchase and distribution of poliomyelitis vaccine which was utilized by the local Indiana County health officers in inoculating school children. Records from the Indiana State Board of Health indicate that during 1956 poliomyelitis vaccine was available through contracts negotiated by the United States Public Health Service with Cutter Laboratories, Lilly, Parke-Davis, Wyeth, Pitman-Moore, Inc. (predecessor in interest to Dow) and Sharp and Dohme, Inc. (a division of Merck).

The federal government maintained general records regarding the distribution of polio vaccine within the United States in 1956 and 1957. These records indicate that the five defendant manufacturers were given quotas of vaccine available for sale in Indiana during 1956 and 1957. They include releases from March 15, 1956, through July 26, 1956, and cover vaccines with a useful life through the date of the first inoculation of Kathryn. They reflect that of the total authorizations during that period Lilly had about 75 percent and Dow's predecessor about 11 percent, with less than 2 percent

---

[5]The average incubation period for poliomyelitis is one to two weeks but symptoms may develop between three and thirty-five days after exposure. If plaintiff Sheffield contracted poliomyelitis as a result of defective Salk vaccine, as appellants claim, she must have received such vaccine at the time of the February 1957 inoculation: the incubation period is far too short to implicate the initial inoculation in October.

in one authorization to Sharpe and Dohme, and the balance with Wyeth and Parke Davis.

The Indiana State Board of Health has furnished records of purchases for the public inoculation program with federal funds for the period from December 8, 1955, through April 30, 1957. These records were prepared at the request of the regional office of HEW and list each purchase and the manufacturer. They reflect that 79 percent of the vials of vaccine purchased by the board was manufactured by Lilly, and that none was purchased from Merck's Sharpe and Dohme division during the period involved. Plaintiffs also secured some records of the distribution of polio vaccine by the state board of health to the respective counties in Indiana, but those records fail to indicate the manufacturer of the vaccine so distributed to Wayne and the other counties.

Microfilms of the records of Davis' predecessor, Pitman-Moore, have been made available to plaintiffs. The records examined to the date of the hearing on the motions reflect that representatives of the manufacturers were meeting in 1955 to cooperatively solve technical problems in connection with the production of a safe polio vaccine; that there were other exchanges of information and products and processes in order to obtain that result; and that all manufacturers cooperated with the Pharmacy and Chemical Council of the American Medical Association in its evaluation of the Salk poliomyelitis vaccine.

On appeal plaintiffs contend that the trial court has deprived them of the right to produce further evidence regarding the activities of the defendants between and among one another with respect to the manufacture and distribution of polio vaccine in the relevant time period. The court did deny in December 1979 plaintiffs' application for a commission to take the depositions of certain present and former employees of Lilly because in June and November plaintiffs had been granted continuances to take those depositions and had failed to do so in a timely manner. We cannot fault the discretion of the court in so ruling. The plaintiffs suffered no prejudice thereby. The record is replete with evidence that there was cooperation between the manufacturers themselves and HEW. It is obvious that "concert of action" was all directed toward producing a safe vaccine. (See part V below.)

I

The Market Share Liability Expounded in *Sindell* v. *Abbott Laboratories* Is Not Applicable to This Case.

On March 20, 1980, two days after the motion for summary judgment of Parke Davis had been granted after a hearing in open court, the Supreme

Court filed its decision in *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588. Plaintiffs' expectations did not bear full flower. The court reiterated the general rule governing proof of causation as follows: "We begin with the proposition that, as a general rule, the imposition of liability depends upon a showing by the plaintiff that his or her injuries were caused by the act of the defendant or by an instrumentality under the defendant's control. The rule applies whether the injury resulted from an accidental event (e.g., *Shunk* v. *Bosworth* (6th Cir. 1964) 334 F.2d 309) or from the use of a defective product. (E.g., *Wetzel* v. *Eaton Corporation* (D.Minn. 1973) 62 F.R.D. 22, 29-30; *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 873-875 . . . ; and see Annot. collection of cases in 51 A.L.R.3d 1344, 1351; 1 Hursh & Bailey, American Law of Products Liability (2d ed. 1974) p. 125.)" (*Id.,* pp. 597-598; see, in addition to the authorities cited by the court, Rest.2d Torts, § 433 B(1), p. 441; Annot., Products Liability—Drug or Medicine (1961) 79 A.L.R.2d 301, 338; *Namm* v. *Charles E. Frosst & Co.* (1981) 178 N.J.Super. 19, 27-28 [427 A.2d 1121, 1125].)

The majority decision also rejected the contention that the burden of proof should be shifted to the defendants under the theory enunciated in *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], where the conduct of the actors was tortious with respect to the plaintiff and it was uncertain which one had caused the harm. (*Id.,* at pp. 598-603; and see part IV below.) It further refused to apply the so-called "concept of action theory" (*id.,* at pp. 603-606; and see part V below) or the concept of "industry-wide" liability (*id.,* pp. 607-610, and see part II below).

The decision, however, did extend the principle of *Summers* v. *Tice, supra,* and created a "market share" theory of liability. It held that the likelihood that any one of several manufacturers of a generic drug, marketed and promoted for a use which proved to produce harmful effects in the yet unborn daughters of the women to whom it was administered, supplied the product that allegedly injured the plaintiff may be measured by the percentage which the product sold by each such manufacturer bears to the entire production of the drug sold by all for that purpose. (*Id.,* at pp. 610-613.) For the reasons stated below, we decline to extend the theory behind the foregoing decision to the manufacturers of a product not intrinsically defective for the purpose for which it was used.

Plaintiffs assume that *Sindell* involved exactly the question raised by the defendants in their motion for summary judgment, namely, the necessity of establishing the identity of the actual manufacturers of the vaccine received by the plaintiff daughter. The cases are similar in one respect. The plaintiffs, allegedly through no fault of either, cannot establish the identity of the specific manufacturer of the vaccines that were administered in 1956 and

1957; nor, because of the passage of time, can any of the defendants determine that fact.[6] They disregard the dissimilarities in the facts of the respective two cases and conclude on the basis of the foregoing deficiency of evidence that the burden of proof in this case should be shifted to each of the defendants to demonstrate that it could not have produced or distributed the defective vaccine that allegedly injured the plaintiff, and that on failure to do so each should be liable for the plaintiffs' damages according to its share of the relevant market.

It is true that in each case the manufacturers were making a generic pharmaceutical product according to a uniform formula and a process approved by the federal government. Here, unlike *Sindell,* the injuries did not result from the use of a drug generally defective when used for the purpose it was marketed, but because some manufacturer made and distributed a defective product. The product that allegedly injured the plaintiffs was itself not a unit of a total generic pharmaceutical product but a deviant defective vaccine.

In each case the victim and the defendants were unable to trace the source of the product because of a delay in discovering the alleged source of the victim's injury. In *Sindell,* the delay was occasioned because the potential for harm was latent and did not manifest itself for many years, whereas in this case the onset of the illness occurred shortly after the victim was inoculated with the vaccine. For purposes of these proceedings we must assume that plaintiffs' allegations satisfy the defenses of limitations and laches. Nevertheless in formulating general policy we cannot overlook the fact that the delay in discovering the alleged causation was in no way related to the nature of the defective product or any other act or omission of the unknown tortfeasor. The record reflects that it was known to the medical profession that positive findings of live virus were found in certain lots of 1955 vaccine; that the vaccination program was suspended; and that Cutter ceased manufacturing the vaccine. More specifically, it appears that reports

---

[6]The record does show that the defendant Merck has apparently demonstrated that it could not have made the product which caused plaintiffs' injuries. (Cf. *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588, 612.) The testimony of the former Indiana State Health Commissioner shows that detailed records were kept of vaccine purchases as required by HEW. (See fn. 3 above.) It was vaccine so purchased that was distributed to the counties for the public vaccination program in which plaintiff's daughter allegedly participated. Those records reflect that the first purchase from Merck's Sharpe & Dohme division was made May 6, 1957 after plaintiff's second vaccination. Although there is some evidence that some Sharpe & Dohme vaccine with an expiration date of November 4, 1956, a month after the plaintiff's first inoculation was released on March 21, 1956, for use in Indiana, there is nothing to show that it was used in the public program. In fact the records discovered by plaintiff reflect that only federally purchased vaccine was so distributed. The fact that the health commissioner did not know, or could not recall, that local programs purchased vaccine from other sources falls short of establishing that the Wayne County program did so.

of untoward incidents were encouraged, and that defendant Merck, for example, received numerous reports of such incidents which were contemporaneously investigated. So far as the general necessity of allowing a "market share" approach because the passage of time has made identification impossible is concerned, there is little parallel between the scenario in *Sindell* and that in this case.

Nor does the rationale of *Sindell* apply to the facts established by this record. In support of the plunge into hypothetically charted[7] but yet unauthenticated waters, Justice Mosk relied upon Justice Traynor's landmark concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-468 [150 P.2d 436], for the proposition that the courts should fashion remedies to meet the changing needs of our complex industrialized society. Justice Traynor recognized that in an era of mass production and complex marketing methods the traditional standard of negligence was insufficient to govern the obligations of manufacturer to consumer, and that the manufacturer should guarantee the safety of his product even when there is no negligence. (*Id.,* at p. 465.) In *Sindell,* the stated need was because "[i]n our contemporary complex industrialized society, advances in science and technology create *fungible goods which may harm consumers* and which cannot be traced to any specific producer." (26 Cal.3d at p. 610, italics added.) Neither suggests that the costs of injury should be assessed against a manufacturer whose product is not harmful.

To fashion the remedy the court resorted to *Summers* v. *Tice, supra,* 33 Cal.2d 80, where the court stated, "They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can. The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the harm. If one can escape the other may also and plaintiff is remediless. Ordinarily defendants are in a far better position to offer evidence to determine which one caused the injury." (33 Cal.2d at p. 86.) The *Sindell* opinion embraces the first part of that statement: "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." (26 Cal.3d at pp. 610-611; see also Rest.2d Torts, § 433B (3), coms. f and h, p. 446.) The court observed that in both *Sindell* and *Summers,* the plaintiff was not

---

[7]In the Fordham Comment (see p. 587 above), the author described the problem arising from the second generation injuries resulting from the mother's ingestion of DES. The comment suggested a theory of "enterprise" (better "industry-wide") liability and suggested that damages be apportioned among the defendants, the producers of 75 or 80 percent of the DES prescribed for the prevention of miscarriage, according to the respective share of the market attributable to each. (46 Fordham L.Rev. at p. 994, fns. 179-181 and pp. 999-1000, fns. 208-211 and accompanying text.)

at fault in failing to provide evidence of a causation, an assumption that we must make on the record before us. It added that in *Sindell,* as in the case here, as distinguished from *Summers,* the absence of such evidence is not attributable to the defendants, but it then went on to add, as is not the situation here, that the DES manufacturers' conduct in marketing a drug, the effects of which are delayed for many years, played a significant role in creating the unavailability of proof. (*Id.,* at p. 611.)

It is obvious from the foregoing that neither *Summers* itself, nor *Summers* as exposited in *Sindell,* can furnish a key to unlock a treasure chest of a shared liability indiscriminately imposed on manufacturers of safe and defective products of the same nature. The rule of *Summers* only applies where it is proved that each of two or more actors has acted tortiously. The plaintiff has the burden of proving that each of the actors so conducted itself. "The rule stated has no application to cases of alternative liability, where there is no proof that the conduct of more than one actor has been tortious at all. In such a case the plaintiff has the burden of proof both as to the tortious conduct and as to the causal relation." (Rest.2d Torts, § 433 B(3), com. g., p. 446; see also *Shunk* v. *Bosworth* (6th Cir. 1964) 334 F.2d 309, 312, as cited with approval in *Sindell,* 26 Cal.2d at p. 598.)

As a further cornerstone for the remedy he created Justice Mosk again relied upon Justice Traynor. The *Sindell* opinion recites: "From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. As was said by Justice Traynor in *Escola,* '[t]he cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' (24 Cal.2d p. 462; see also Rest.2d Torts, § 402 A, com. c, pp. 349-350.) The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 129 . . . ; *Beech Aircraft Corp.* v. *Superior Court* (1976) 61 Cal.App.3d 501, 522-523 . . . .) These considerations are particularly significant where medication is involved, for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs." (26 Cal.3d at p. 611.)

Here again one seeks in vain for a shift of responsibility to innocent manufacturers. Section 402 A of the Restatement, as cited provides: "(1) One who sells any product *in a defective condition* unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby

caused to the ultimate user or consumer, . . ." (Rest.2d Torts, at pp. 347-348, italics added.) In *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], the court deleted the requirement of showing that the defective product was "unreasonably dangerous to the user or consumer" (8 Cal.3d at pp. 127-135; see also *Beech Aircraft Corp.* v. *Superior Court* (1976) 61 Cal.App.3d 501, 522-523 [123 Cal.Rptr. 541]), but it reiterated that the injured plaintiff was required to prove that the product contained a defect. (8 Cal.3d at p. 134.)

The "deep pocket"[8] theory may be socially desirable as a vehicle to insure that all victims of a defective product will be compensated from an industry-wide fund; but if applied indiscriminately to penalize the careful and careless producer alike it fails to act as a deterrent to the latter or provide an incentive to product safety industry-wide, and it may result in keeping beneficial but potentially dangerous products off the market. It may not be solely sufficient merely to say that it would be legally and morally irresponsible to hold manufacturers, who never produced a defective vaccine, to be liable on a market share basis for the damage caused by one manufacturer who did. It is clear, however, that one manufacturer cannot force its competitors to discover or guard against defects in its products. The imposition of such a liability over that portion of the pharmaceutical industry producing the beneficial safe product would inhibit drug research and development, unreasonably raise the cost of health care, and punish drug manufacturers who have done no wrong. (See Note, *Sindell* v. *Abbott Laboratories: A Market Share Approach to DES Causation* (1981) 69 Cal.L.Rev. 1179, 1200-1202; Franklin and Mais, *Tort Law and Mass Immunization Programs: Lessons from the Polio and Flu Episodes* (1977) 65 Cal.L.Rev. 754, *passim*; Fischer, *Products Liability—An Analysis of Market Share Liability* (1981) 34 Vand.L.Rev. 1623, 1652-1653; Comment, *Refining Market Share Liability: Sindell v. Abbott Laboratories* (1981) 33 Stan.L.Rev. 937, 944; Note, *Market Share Liability for DES (Diethystilbestrol) Injury: A New High Water Mark in Tort Law* (1981) 60 Neb.L.Rev. 432, 444-446.)

There is a recognized public policy in encouraging the swift production and marketing of new pharmaceutical products which prevent disease and save human life. In the case of Salk vaccine the record reflects that there was an enormous decrease in the incidence of poliomyelitis following the

---

[8]See Richardson, J., dissenting, *Sindell* v. *Abbott Laboratories, supra*, 26 Cal.3d 588, 618.

nationwide inoculation program.[9] The results of that program reflected that the vaccine, when properly manufactured and tested, was safe.[10] Nevertheless when Sabin oral vaccine, involving the use of live, but attenuated, polio virus, was substituted because it gave quicker protection from a threatened polio outbreak, and the disease was suffered after ingesting the vaccine, a liability was imposed on the manufacturer for failure to warn of that possibility. (*Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 434-442 [79 Cal.Rptr. 369]; *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, 1273-1275, cert. den. 419 U.S. 1096 [42 L.Ed.2d 688, 95 S.Ct. 687]; and see Franklin and Mais, *supra,* 65 Cal.L.Rev. 754, 755-768.) As a result when the public interest indicated a national program for swine flu should be undertaken there was a reluctance on the part of the insurance companies to insure the risks, and the federal government undertook to underwrite liability so that the pharmaceutical companies would participate. (Franklin and Mais, *supra,* 65 Cal.L.Rev. at pp. 769-775; Appel, *Liability in Mass Immunization Programs* (1980) B.Y.U. L.Rev. 69, 69-75, 90-91; and see *In re Swine Flu Immunization Prod. Liability Lit.* (D.Utah 1982) 533 F.Supp. 703, 714, 716-727; *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588, 619, 621-622, Richardson, J., dis.; Rest.2d Torts, § 402 A, com. k, pp. 353-354, note also, Henderson, *The Boundary Problems of Enterprise Liability* (1982) 41 Md. L.Rev. 659, 674, fn. 62, 675-676; Note, *Market Share Liability for DES (Diethystilbestrol) Injury: A New High Water Mark in Tort Law, supra,* 60 Neb. L.Rev. 432, 446-449; and Note, *Strict Liability for Drug Manufacturers: Public Policy Misconceived* (1961) 13 Stan.L.Rev. 645, 651-652.)

---

[9]In *Reyes* v. *Wyeth Laboratories* (5th Cir. 1974) 498 F.2d 1264, the court observed "Twenty or thirty years ago poliomyelitis was a dread disease that especially attacked the very young. In 1952 alone, there were 57,879 reported cases of polio in the United States; 21,269 of these resulted in crippling paralysis to the victims. By 1970, when Anita Reyes contracted polio, the number of those stricken by polio had diminished dramatically; she was one of just 33 individuals to be afflicted during that year. [Fn. omitted.] Credit for this precipitous decline must go primarily to the medical researchers who discovered the viral nature of the disease, and were able to isolate and reproduce the virus in an inactivated or an attenuated form. See Appendix B. But credit for this remarkable achievement must also be given to such laboratories as Wyeth, which processed the polio vaccine, and to massive federal-state public health programs for the administration of the vaccine." (498 F.2d 1264, 1269-1270.)

[10]Material inserted in the record by plaintiffs reflects the history of the discovery of the development of a means of growing poliomyelitis virus, the development of a safe and effective polio vaccine by Dr. Salk, the experimental testing and use of the vaccine in 1953 and 1954, the release of the vaccine in April 1955, the *Cutter* incident with a moratorium for the program, and its renewal. It concludes: "It was estimated that by the end of 1957, between sixty and one hundred million persons had been inoculated with Salk vaccine. . . . The only incident in this entire vaccination program to show the Salk vaccine to be anything other than a *safe* and *effective* product for mankind, was the 'Cutter incident . . . .'" (*Gottsdanker* v. *Cutter Laboratories, supra,* 182 Cal.App.2d 602; see also *Reyes* v. *Wyeth Laboratories, supra,* at pp. 1295-1298, appen. B.)

It is not unreasonable to assume that if the theory advocated by plaintiff had been generally prevalent in the mid-1950's there would have been a reluctance to proceed with the dispatch that intercepted projected incidents of poliomyelitis in 1956 and 1957 and there would have been thousands of sufferers who, in fact, were saved by the Salk vaccine program.

The difficulties of the apportionment mandated by *Sindell* are not all present in this case because, admittedly, all of the manufacturers have been joined. Defendants Wyeth and Merck suggest that insofar as *Sindell* imposes market share liability to relieve the injured party from joining less than a substantial share, it is unnecessary in a case where all are joined. We are not of the opinion that the presence of all manufacturers would defeat the application of *Sindell* in a proper case. Consideration of apportionment, however, does highlight the difference between this case and *Sindell*.

"Each defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries. . . . [¶] Under this approach, each manufacturer's liability would approximate its responsibility for the injuries caused by its own products. . . ." (26 Cal.3d at p. 612.) It is obvious that if four innocent manufacturers are required to share in paying plaintiffs' damages because none can prove that plaintiff daughter was not inoculated with its vaccine, the liability of each is in no way commensurate with its responsibility for an injury caused by its own product. By the same token the tortfeasor who manufactured the defective vaccine is receiving an undeserved contribution.

For the foregoing reasons we hold that the market share liability expounded in *Sindell* is not applicable in this case.[11]

---

[11]It has been suggested that *Sindell* could be applied to injuries from cigarettes, food additives, generic drugs, asbestos, pesticides, aluminum wire, industrial waste and products that cause industrial pollution. (Fischer, *Products Liability: An Analysis of Market Share Liability, supra,* 34 Vand. L.Rev. 1623, 1652.) The same author notes, however, that its application should be limited to fungible goods which themselves are hazardous or defectively designed, and that it would be counterproductive to apply *Sindell* to a case such as this where there are appropriate control standards and the injury results from a manufacturing defect rather than a general design defect. In such case the manufacturer, if he is to be liable for a share of the market in any event, may have no incentive to spend more for controls. (*Id.,* at p. 1653.)

In asbestos cases the courts have imposed joint and several liability where the plaintiff has identified several manufacturers of the dangerous product to which he has been exposed. (See *Borel* v. *Fibreboard Paper Products Corporation* (5th Cir. 1973) 493 F.2d 1076, 1094-1096, cert. den. 419 U.S. 869 [42 L.Ed.2d 107, 95 S.Ct. 127], applying Texas law.) In a later case the principles of *Sindell* were applied to permit responsibility to be apportioned among culpable manufacturers on a market share basis. (*Hardy* v. *Johns-Manville Sales Corp.* (E.D.Tex. 1981) 509 F.Supp. 1353, 1356-1360, revd. on other issues (5th Cir. 1982) 681 F.2d 334, applying Texas law; contra, *Starling* v. *Seaboard Coast Line R. Co.* (S.D.Ga.

II

■ *Plaintiffs Are Not Entitled to Assert a Cause of Action Against Respondents on the Basis of "Enterprise Liability."*

The second of the two grounds for reversal originally urged by plaintiffs on their appeal rests upon the decision in *Hall* v. *E. I. Du Pont De Nemours & Co., Inc., supra*, 345 F.Supp. 353. A similar attempt to predicate liability on that case was analyzed and rejected in *Sindell* as follows: "A third theory upon which plaintiff relies is the concept of industry-wide liability, or according to the terminology of the parties, 'enterprise liability.' This theory was suggested in *Hall* v. *E. I. Du Pont De Nemours & Co., Inc.* (E.D.N.Y. 1972) 345 F.Supp. 353. In that case, plaintiffs were 13 children injured by the explosion of blasting caps in 12 separate incidents which occurred in 10 different states between 1955 and 1959. The defendants were six blasting cap manufacturers, comprising virtually the entire blasting cap industry in the United States, and their trade association. There were, however, a number of Canadian blasting cap manufacturers which could have supplied the caps. The gravamen of the complaint was that the practice of the industry of omitting a warning on individual blasting caps and of failing to take other safety measures created an unreasonable risk of harm, resulting in the plaintiffs' injuries. The complaint did not identify a particular manufacturer of a cap which caused a particular injury. [Fn. omitted, which pointed out that the *Hall* decision, predicated on an assumption that there existed a national body of state tort law, was undermined by the same court's later decision that the plaintiffs' claims should be severed and tried in the respective federal districts where each injury occurred.]

"The court reasoned as follows: there was evidence that defendants, acting independently, had adhered to an industry-wide standard with regard to the safety features of blasting caps, that they had in effect delegated some functions of safety investigation and design, such as labelling, to their trade association, and that there was industry-wide cooperation in the manufacture and design of blasting caps. In these circumstances, the evidence supported a conclusion that all the defendants jointly controlled the risk. Thus, if

---

1982) 533 F.Supp. 183, 186-189, applying Georgia law; and *In re Related Asbestos Cases* (N.D.Cal. 1982) 543 F.Supp. 1152, 1158, distinguishing *Sindell* under California law.)

Several cases have refused to apply *Sindell* in DES cases. (See *Morton* v. *Abbott Laboratories* (M.D.Fla. 1982) 538 F.Supp. 593, 599-600, applying Florida law; *Ryan* v. *Eli Lilly & Co.* (D.S.C. 1981) 514 F.Supp. 1004, 1018-1019 and *Mizell* v. *Eli Lilly & Co.* (D.S.C. 1981) 526 F.Supp. 589, 594-596, applying South Carolina law, and note, *Tidler* v. *Eli Lilly and Co.* (D.D.C. 1982) 95 F.R.D. 332, 334-336, rejecting *Sindell* and *Bickler,* for District of Columbia and Maryland; *Payton* v. *Abbott ·Labs* (D.Mass. 1981) 512 F.Supp. 1031, rejecting concert of action, aiding and abetting and joint venture under Massachusetts law and referring "market share" to Massachusetts court.)

plaintiffs could establish by a preponderance of the evidence that the caps were manufactured by one of the defendants, the burden of proof as to causation would shift to all the defendants. The court noted that this theory of liability applied to industries composed of a small number of units, and that what would be fair and reasonable with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of countless small producers. [Fn. quoting *Hall* omitted.]

"Plaintiff attempts to state a cause of action under the rationale of *Hall*. She alleges joint enterprise and collaboration among defendants in the production, marketing, promotion and testing of DES, and 'concerted promulgation and adherence to industry-wide testing, safety, warning and efficacy standards' for the drug. We have concluded above that allegations that defendants relied upon one another's testing and promotion methods do not state a cause of action for concerted conduct to commit a tortious act. [See part V below.] Under the theory of industry-wide liability, however, each manufacturer could be liable for all injuries caused by DES by virtue of adherence to an industry-wide standard of safety.

"In the Fordham Comment [see text, p. 587 above], the industry-wide theory of liability is discussed and refined in the context of its applicability to actions alleging injuries resulting from DES. The author explains causation under that theory as follows, '. . . [T]he industry wide standard becomes itself the cause of plaintiff's injury, just as defendants' joint plan is the cause of injury in the traditional concert of action plea. Each defendant's adherence perpetuates this standard, which results in the manufacture of the particular, unidentifiable injury-producing product. Therefore, each industry member has contributed to plaintiff's injury.' (Fordham Comment, *supra,* at p. 997.)

"The comment proposes seven requirements for a cause of action based upon industry-wide liability,[12] and suggests that if a plaintiff proves these elements, the burden of proof of causation should be shifted to the defen-

---

[12]In a footnote at this point the court states: "The suggested requirements are as follows:

"1. There existed an insufficient, industry-wide standard of safety as to the manufacture of the product.

"2. Plaintiff is not at fault for the absence of evidence identifying the causative agent but, rather, this absence of proof is due to defendant's conduct.

"3. A generically similar defective product was manufactured by all the defendants.

"4. Plaintiff's injury was caused by this defect.

"5. Defendants owed a duty to the class of which plaintiff was a member.

"6. There is clear and convincing evidence that plaintiff's injury was caused by a product made by one of the defendants. For example, the joined defendants accounted for a high percentage of such defective products on the market at the time of plaintiff's injury.

"7. All defendants were tortfeasors."

dants, who may exonerate themselves only by showing that their product could not have caused the injury. (Fn. omitted.)

"We decline to apply this theory in the present case. At least 200 manufacturers produced DES; *Hall,* which involved 6 manufacturers representing the entire blasting cap industry in the United States, cautioned against application of the doctrine espoused therein to a large number of producers. (345 F.Supp. at p. 378.) Moreover, in *Hall,* the conclusion that the defendants jointly controlled the risk was based upon allegations that they had delegated some functions relating to safety to a trade association. There are no such allegations here, and we have concluded above that plaintiff has failed to allege liability on a concert of action theory.

"Equally important, the drug industry is closely regulated by the Food and Drug Administration, which actively controls the testing and manufacture of drugs and the method by which they are marketed, including the contents of warning labels.[13] To a considerable degree, therefore, the standards followed by drug manufacturers are suggested or compelled by the government. Adherence to those standards cannot, of course, absolve a manufacturer of liability to which it would otherwise be subject. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 . . . .) But since the government plays such a pervasive role in formulating the criteria for the testing and marketing of drugs, it would be unfair to impose upon a manufacturer liability for injuries resulting from the use of a drug which it did not supply simply because it followed the standards of the industry." [Fn. omitted.] (26 Cal.3d at pp. 607-610.)

Plaintiffs rely upon the allegations of their ultimate amendment to their amended complaint that are set forth in the margin.[14] They further allege

---

[13]In a footnote at this point the court states: "Federal regulations may specify the type of tests a manufacturer must perform for certain drugs (21 C.F.R. § 436.206 et seq.), the type of packaging used (§ 429.10), the warnings which appear on labels (§ 369.20), and the standards to be followed in the manufacture of a drug (§ 211.22 et seq.)."

[14]They allege that the defendants "and each of them were members of and participants in a joint and concerted enterprise organized by said defendants and/or others to develop, manufacture, produce, sell and distribute Salk Antipolio vaccine in the United States. Pursuant to this joint and concerted enterprise, said defendants jointly and collectively engaged in, were involved with, participated in and conducted experiments, tests, studies, conferences, seminars regarding the compounding, manufacture, development, testing, inspection, packaging, storage, sale, distribution, injection and marketing of Salk Antipolio vaccine, including that vaccine which was injected into the plaintiff KATHRYN SHEFFIELD in 1956 and 1957. In addition, and in furtherance of this joint and concerted enterprise, plaintiffs are informed and believe that the defendants and each of them exchanged, transmitted and shared with one another data, test results, studies, articles, memoranda, and other information regarding the production, development, testing, manufacture, compounding, packaging, storage, sale, marketing and distribution of said vaccine. Plaintiffs are further informed and believe that there existed as a result of this joint and concerted enterprise a common and

that those activities were carried on by the defendants for their mutual and collective benefit and profit and to facilitate the sale and marketing of Salk vaccine. In order to show some wrongful industry-wide standard of safety they further allege the defendants were negligent and careless in that they knew or should have known that the activities set forth in the margin and the information received therefrom could and did lead to the production, manufacture, sale and distribution of defective Salk vaccine, particularly that furnished plaintiff daughter. The record, even if confined to that produced by plaintiffs, is to the contrary. Plaintiffs' proof shows that the activities related were all designed to insure that a nondefective Salk vaccine was produced through mutual cooperation, and promoted, not by the manufacturers, but by the federal government, through HEW and the National Foundation for Infantile Paralysis.

Since there was no joint or collective action which would result in the production of defective vaccine, as distinguished from any individual failure to follow the standards developed, there was no duty to warn the general public of the existence of hazards and dangers from defective Salk vaccine (a contradiction in terms), and plaintiffs' allegations predicating liability on a collective failure to warn must be disregarded as inconsistent with the proof in the record.

Plaintiffs failed to show that there was an inadequate industry-wide standard of safety. Their proof has established a case showing the lack of the industry-wide negligence which was present in *Sindell* where the court nevertheless refused to impose industry-wide liability for a drug that was generally defective for the purpose for which it was prescribed. It would certainly be unfair to impose upon the manufacturer of a safe drug liability for a defectively manufactured specimen of the same drug which it did not supply simply because it, as distinguished from the tortfeasor, followed the standards of the industry. (See 26 Cal.3d at p. 610.)

Plaintiffs urge that in this case, as in *Hall* but unlike *Sindell,* all of the potential tortfeasors are before the court. The defendants therefore may not be able to argue that it would be manifestly unreasonable to apply the *Hall* theory to a decentralized industry composed of countless small producers. (26 Cal.3d at p. 608.) This thread, however, cannot support the conclusion that industry-wide liability should be applied in this case. The weight of the

---

mutually agreed formula for the Salk Antipolio vaccine, and that the various brands of said vaccine manufactured by each said defendants were marketed and advertised by defendants as being fungible and interchangeable with all other brands of the vaccine. Plaintiffs are also informed and believe that there was a joint and concerted activity with respect to the sale, marketing and advertising of the subject vaccine by said defendants and each of them.''

countervailing factors is too great to enable the plaintiffs to bind the defendants to the liability imposed in *Hall*.

The *Sindell* court noted the seven factors that the Fordham Comment suggested should be present to impose such liability. (See fn. 12 above.) Here the record reflects that there existed a sufficient, rather than an insufficient industry-wide standard of safety as to the manufacture of the product. Here it is still an open question whether the plaintiffs were at fault for the absence of evidence identifying the causative agent, and it is clear that the defendants' conduct in no way contributed to the delay in such alleged identification. The record fails to show that a generically defective product was manufactured by all the defendants; it is clearly alleged, and shown by the record that only one, if any, of the defendants manufactured such a product. It is true that it must be assumed at this stage of the proceedings that plaintiffs' injuries were caused by a defective vaccine. Defendants did owe a duty to the class of which plaintiffs were members to produce a safe vaccine, but it is not shown that the joined defendants accounted for a high percentage of any defective products on the market at the time of plaintiffs' injury. In fact, the record fails to show that there was any defective Salk vaccine on the market at the time of plaintiffs' injury, other than that dose with which she was vaccinated. Finally, it is clear from the record that only one of the defendants could be the alleged tortfeasor.

We therefore uphold the action of the trial court in refusing to apply the industry-wide theory of liability to the facts of plaintiffs' case as alleged and as shown by the uncontradicted facts adduced on the motion for summary judgment.

### III

*Liability May Not Be Predicated on Breach of a Duty to Warn.*

The foregoing disposes of the theories urged by plaintiffs in their opening brief. Over the objection of defendant Parke Davis (denied without prejudice) plaintiffs further contend in their closing brief that the record fails to rebut their right to recover on any of the theories of negligent failure to warn, concert of action and enterprise liability.

In their amended complaint each plaintiff set forth five causes of action. The first charged the defendants jointly and severally with negligence in compounding, manufacturing, testing, inspecting, packaging, storing, selling, distributing and injecting Salk vaccine so as to cause it to be defective and unsafe for the use for which it was intended in that it was contaminated, adulterated, impure and deleterious, causing the person inoculated with the

said vaccine to contract polio, encephalitis and/or other serious paralytic disease. The second charges the defendants jointly and severally with breach of an express warranty of merchantable quality that the drug was fit and safe for the use for which it was intended, and the third alleges breach of an implied warranty of the same tenor. The fourth cause of action charges that at the time the Salk vaccine administered to plaintiff daughter was manufactured, compounded, tested, inspected, packaged, stored, sold and distributed and injected into plaintiff it was defective, and that the defendants are jointly and severally strictly liable in tort.

The fifth cause of action charges that the defendants, jointly and severally, intentionally, wilfully and maliciously with conscious disregard of the rights of plaintiff and the general public compounded, etc. the vaccine administered to plaintiff daughter knowing it was defective, dangerous, and unsafe for the use for which it was intended in that it was contaminated, adulterated, impure, deleterious and likely to cause harm to plaintiff as well as other persons engendering in them polio, encephalitis and other serious disease. Further allegations charge that the defendants with such knowledge failed to warn the plaintiff and the public at large of the deleterious nature of the vaccine, failed to recall it, and continued to compound, etc. said defective vaccine for business profit.

By their amendments to its first amended complaint the plaintiffs allege first that from the joint and concerted enterprise of defendants (see fn. 14 above) they should have known that it would lead to the production, manufacture, sale and distribution of defective Salk vaccine, including its vaccine administered to plaintiff in 1957, and defendants negligently and carelessly failed to warn the general public of the hazards and dangers from defective Salk vaccine. Secondly, that from those activities the defendants in fact knew of the hazards and damages from defective Salk vaccine and wilfully and intentionally failed to warn and thirdly, that the defendants were strictly liable for failure to warn.

Although the amended complaint is unverified and the amendments are alleged on information and belief, the plaintiffs assert that we may disregard the allegations that their case rests on the vaccination with a defective vaccine (which could only be the product of one manufacturer) and apply the theory of enterprise liability (see part II above), or the alleged theories of negligent failure to warn or concert of action. As we have pointed out above, the failure to warn approach founders in a record which not only fails to show that Salk vaccine as properly manufactured, compounded, tested, inspected, packaged, stored, sold, distributed and injected in accordance with prescribed federal standards—albeit that the defendants participated in the preparation of those standards—was dangerous, but also affir-

matively shows it was safe when those standards were observed. There is nothing in this record to indicate that each manufacturer should be his brother's keeper, or owed it to the public to publish unnecessary warnings that would be contraproductive to the national program to reduce and abolish the toll of poliomyelitis.

This is not a case where there are known risks in taking a drug and the product is distributed without a proper warning of such risks. (See *Grinnell* v. *Charles Pfizer & Co., supra,* 274 Cal.App.2d 424, 436-441; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 710-711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988]; and *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121, 127-131; Rest.2d Torts, § 402 A, coms. j and l.) Unlike the Sabin polio vaccine that allegedly injured the plaintiff in *Davis*, there is nothing in the record to reflect that Salk polio vaccine, if properly manufactured, would cause the disease itself. In those cases, the record reflected that before the plaintiff took the live but attenuated vaccine, the Surgeon General had issued a report on *Sabin* vaccine warning of the small but definite risk that polio could possibly ensue from taking that type vaccine. (See 274 Cal.App.2d at pp. 436-441; 399 F.2d at pp. 123-125, 131, fn. 20.) There is no comparable data in our record.

## IV

**▮** *Liability May Not Be Predicated on Res Ipsa Loquitur and Alternative Liability.*

In *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868 [148 Cal.Rptr. 843], the court affirmed a judgment of nonsuit in an action against the manufacturers of sabres, where the plaintiff was unable to identify the manufacturer of a dueling sabre with an alleged and proved defectively narrow blade. The court distinguished *Summers* v. *Tice, supra,* where both defendants were negligent toward plaintiff and in affirming the judgment concluded, "Here, the appellant has not shown that either respondent has violated a duty to him (i.e., produced the defective product) and seeks wrongly to place on them the burden of proving his case which he himself has found too heavy to bear." (84 Cal.App.3d at p. 875; and see *Sindell,* as quoted above at p. 18.)

In an effort to avoid a similar result in this case the plaintiffs resort to the doctrine of res ipsa loquitur. In *Sindell,* the court in discussing the theory of "alternative liability" expounded in *Summers* v. *Tice, supra,* remarked: "In *Summers,* we relied upon *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 . . . . There, the plaintiff was injured while he was unconscious during the course of surgery. He sought damages against several doctors and a nurse

who attended him while he was unconscious. We held that it would be unreasonable to require him to identify the particular defendant who had performed the alleged negligent act because he was unconscious at the time of the injury and the defendants exercised control over the instrumentalities which caused the harm. Therefore, under the doctrine of res ipsa loquitur, an inference of negligence arose that defendants were required to meet by explaining their conduct." (26 Cal.3d at p. 599, fn. omitted.)

Plaintiffs refer to *Anderson* v. *Somberg* (1975) 67 N.J. 291 [338 A.2d 1], certiorari denied 423 U.S. 929 [46 L.Ed.2d 258, 96 S.Ct. 279], in which case the plaintiff was injured because a surgical instrument broke. In addition to the doctor and the hospital, he joined the distributor and manufacturer of the instrument. The court concluded, "We hold that in a situation like this, the burden of proof in fact does shift to defendants. All those in custody of that patient or who owed him a duty, as here, the manufacturer and the distributor, should be called forward and should be made to prove their freedom from liability." (67 N.J. at p. 302 [338 A.2d at p. 7] fn. omitted.)

In a subsequent DES case against 22 manufacturers the law division of a New Jersey superior court found *Anderson* v. *Somberg* deals with both the inability to identify the precise causative agent and the possibility that the precise causative agent is not among the defendants before the court and holds seemingly without dissent on both issues that a plaintiff's cause of action survives either event. (*Ferrigno* v. *Eli Lilly and Co.* (1980) 175 N.J.Super. 551, 567-568 [420 A.2d 1305, 1313].) The burden was therefore placed on each of the wrongdoing defendants to exculpate itself. The court noted that all of the defendants in the case before it were wrongdoers, and that the only problem was whether there was a likelihood that other than a joined defendant produced the DES actually taken by the plaintiffs. It concluded that under New Jersey law the theory of "alternative liability" could be applied despite such likelihood. It therefore refused to follow rejection of the alternative theory as had been done in *Sindell* (26 Cal.3d at pp. 598-603); and, having so concluded, it found it unnecessary to consider "enterprise liability," (*Hall*), "fair share of the market" (*Sindell*) or "concert of action"; the last of those theories had already been rejected in New Jersey. (175 N.J.Super. at pp. 569-571 [420 A.2d at pp. 1314-1315].) The burden was therefore placed on each of the wrongdoing defendants to exculpate itself.

In *Namm* v. *Charles E. Frosst & Co., supra,* 178 N.J.Super. 19 [427A.2d 1121], another DES case against 44 drug manufacturers and distributing companies, the appellate court upheld a summary judgment as to all the defendants, granted primarily on the grounds that plaintiff had failed to

identify the manufacturer or to produce any evidence linking any individual defendant with the drugs which allegedly caused plaintiffs' injuries. The court applied the general rule as to the burden of proof. (See p. 593 above.) The court distinguished *Anderson* v. *Somberg, supra,* another earlier New Jersey case, and *Summers* v. *Tice, supra,* on two grounds; first because of all the persons who could have been responsible for the injury were not joined, and second because the defendants were in no better position than the plaintiff to identify the culpable person before them. (178 N.J.Super. at pp. 28, 38 [427 A.2d 1121, 1125, 1128]. It expressly disagreed with the interpretation of *Anderson* v. *Somberg, supra,* in *Ferrigno* v. *Eli Lilly and Co., supra,* and declined to follow that case. (*Id.,* at p. 32, fn. 3 [*id.,* at p. 1127, fn. 3].) The *Namm* court noted that *Sindell* had rejected the alternative liability theory and had allowed recovery on a market share theory but declined to apply the principle of alternative liability as it was modified in *Sindell* because the application "would impose liability without fault upon any one who manufactured a product manufactured by others as well. It would result in the taking of the property of all the named defendants in order to pay for harm which may have been caused by only one of the defendants, or even by one who is not a party to the lawsuit, who is unknown to the defendants, over whom they have no control or even any meaningful contact." (*Id.,* at p. 33 [*id.,* at p. 1128].) That indictment is overly strong as applied to *Sindell* because it fails to recognize that all the manufacturers were tortfeasors. It does, however, apply to this case, where the record establishes only one manufacturer was at fault.

*Namm* accepted *Sindell's* analysis of the "enterprise"—"industry-wide"—theory of liability and rejected it also. (*Id.,* at p. 35 [*id.,* at p. 1129].)

In *Abel* v. *Eli Lilly and Co.* (1979) 94 Mich.App. 59 [289 N.W.2d 20], another DES case, the court reversed a summary judgment that had been entered on pleadings which stated a cause of action for concert of action in negligently failing to perform adequate tests and in failing to warn, and for alternative liability because all who produced and distributed the drug in Michigan were joint tortfeasors. The court sustained both theories. Since the record here fails to reflect the facts assumed to be true by the Michigan court and since *Sindell* rejected both of the theories relied upon, we find the Michigan case is not persuasive. (See *Morton* v. *Abbott Laboratories, supra,* 538 F.Supp. 593, 597, fn. 6.)

In seeking to combine res ipsa loquitur with an alternative theory of liability, plaintiffs have failed to establish that any one of the defendants had such a contact with plaintiff daughter that it should be required to come forward and exculpate itself because it alone, or with others who treated or

dealt with plaintiff, was in a better position to identify the culpable party. Nor have plaintiffs shown that all of the defendants are tortfeasors.

In *Sindell*, the court held that the rule of alternative liability enunciated in *Summers* v. *Tice, supra,* and section 433 B (3) of the Restatement 2d of Torts as previously applied could not relieve plaintiff of the burden of proving the identity of the manufacturer which made the drug causing his injuries. It so ruled on the grounds that the possibility that any of the five defendants, out of a potential of two hundred manufacturers, supplied the DES to the plaintiff's mother was so remote that it would be unfair to require each defendant to exonerate itself and that there was a substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury and so the offending producer not named would escape liability altogether. (26 Cal.3d at p. 603.)

This rationale is not present in this case where acknowledgedly all manufacturers are joined. The court, however, did note that in order for the alternative theory to apply it was necessary to show that, as in *Sindell*, where the DES manufactured by each manufacturer was allegedly defective for the purpose it was used, each defendant was a tortfeasor. (*Id.,* at p. 603, fn. 18; and see text above pp. 595 and 596.)[15]

V

Liability May Not Be Predicated on the "Concert of Action" Theory.

In *Bichler* v. *Eli Lilly and Co.* (1982) 55 N.Y.2d 571 [450 N.Y.S.2d 776, 436 N.E.2d 182, 22 A.L.R.4th 171], the court of appeals affirmed a judgment for the plaintiff in a DES case in which the defendant manufacturer had been held liable for all of the plaintiff's damages on the concert of

---

[15]Commentators have generally recognized that in order to apply an extension of alternative liability on an industry-wide basis the plaintiff must show that the defendants concertedly adhered to a dangerous industry-wide safety standard in their manufacture or distribution of an injury producing product or that in some other way all violated a duty toward plaintiff or those similarly situated. (Fordham Comment, *supra,* Fordham L.Rev. 963, 974; Note, *Market Share Liability: An Answer to the DES Causation Problem* (1981) 94 Harv. L.Rev. 668, 673, 677-678; Comment, *Where Have All the Burdens Gone? The Shifts in Products Law: Sindell v. Abbott Laboratories* (1981) 8 Western St.U. L.Rev. 223, 230, fn. 36 and accompanying text; Note, *California Expands Tort Liability Under the Novel "Market Share" Theory: Sindell v. Abbott Laboratories* (1981) 8 Pepperdine L.Rev. 1011, 1042; Note, *Sindell v. Abbott Laboratories—A High Water Mark in Tort Law?* (1981) Utah L.Rev. 655, 669, 670; Note, *Market Share Liability for DES (Diethystilbestrol) Injury: A New High Water Mark in Tort Law, supra,* 60 Neb. L.Rev. 432, 440-441; Fischer, *Products Liability— An Analysis of Market Share Liability, supra,* 34 Vand. L.Rev. 1623, 1653. For a listing of numerous comments on *Sindell,* see Note, *Products Liability: Sindell v. Abbott Laboratories: Proportional Unidentifiable Fairness and the Oklahoma Perspective* (1981) 34 Okla. L.Rev. 843, fn. 2.)

action theory. (See also *Bichler* v. *Eli Lilly and Co.* (1981) 79 App.Div.2d 317 [436 N.Y.S.2d 625].) The court of appeals refused to review the defendant's contention that the instructions were erroneous because it had failed to preserve the objections it urged on appeal by appropriate request or exception in the trial court. (55 N.Y.2d at p. 583 [450 N.Y.S.2d at p. 781, 436 N.E.2d at p. 187].) The reviewing court concluded that in the light of instructions which became the governing law of the case, the jury's verdict had sufficient factual foundation to show concerted action to market DES without adequate testing, by both agreement and by substantial assistance. (*Id.*, at p. 585.) Here any concert of action was designed to and did effect the production of a safe vaccine.[16]

The "concert of action" theory was explored in depth in *Sindell* and rejected. (26 Cal.3d at pp. 603-606.) We find no substantial difference between the allegations contained in the amendments to plaintiffs' amended complaint (fn. 14 above) and those discussed in *Sindell*. In any event the record in this case reflects a situation clearly falling within the principles which led that court to reject the plaintiffs' reliance on that doctrine.

In *Sindell*, the court reviewed section 876 of the Restatement Second of Torts, Professor Prosser's comments on the doctrine and several cases in which the principle had been applied, including hunting and drag race accidents. The following comment governs here: "What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each others' testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experience and methods of others making the same or similar products. Application of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant." (*Id.*, at p. 605; see also text above pp. 596, 599-600, 608-609.)

Furthermore in this case, as distinguished from *Sindell*, the record shows that such concert of action as did take place was designed to produce a safe vaccine, not a drug unfit for the purpose for which it was sold, distributed and used.

### Conclusion

Having examined the facts and the legal principles pertinent to the decision in this case, we turn now to the principles governing the granting of a

[16]In *Abel* v. *Eli Lilly and Co.*, *supra*, [part IV] 94 Mich.App. 59 [289 N.W.2d 20], the court also upheld the concert of action theory as pleaded in a DES case. For a criticism of *Bichler*, see Note, *Parallelism and Concerted Action* (1982) 62 B.U.L.Rev. 633.

summary judgment as codified in section 437c of the Code of Civil Procedure and enunciated by the courts. In *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412 [42 Cal.Rptr. 449, 398 P.2d 785], the well settled rules of the law of summary judgment were succinctly summarized as follows: "The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts. [Citations.]" (*Id.*, at p. 417.)

Those principles have been continuously adhered to despite changes in the statutory law. (See *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 436, fn. 7 [186 Cal.Rptr. 228, 651 P.2d 815]; *Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 362 [178 Cal.Rptr. 783, 636 P.2d 1121]; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 596 [125 Cal.Rptr. 557, 542 P.2d 981]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 20 [112 Cal.Rptr. 786, 520 P.2d 10]; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 146-147 [60 Cal.Rptr. 377, 429 P.2d 889].) ■ The latest pronouncement (see *Brown* v. *Bleiberg, supra,* 32 Cal.3d at p. 436, fn. 7, quoting the foregoing rules as enunciated in *Wozniak* v. *Peninsula Hospital* (1969) 1 Cal.App.3d 716, 722 [82 Cal.Rptr. 84]) recognizes that both before and after the 1973 revision (see *D'Amico* v. *Board of Medical Examiners, supra,* at pp. 20-21 and Stats. 1973, ch. 366, § 2, p. 807) the fruits of discovery could be considered in support of or in opposition to a motion for summary judgment. We have, accordingly, considered the entire record in concluding that the plaintiffs have failed to show either that any particular defendant furnished the defective vaccine that allegedly caused their injuries; that all of the defendants were tortfeasors in that they manufactured a defective product, or a product that necessitated a warning because it was inherently dangerous. Their inability to identify the alleged tortfeasor is admitted.

Here, as in the case of *Sprecher* v. *Adamson Companies, supra,* unless a new rule of law is designed (in this case a shift of the burden of coming forward with evidence to innocent manufacturers who have not been shown to have any connection with the alleged tort perpetrated against plaintiffs) the evidence establishes a complete defense to the plaintiffs' claims. (30 Cal.3d at p. 362; see also *Chern* v. *Bank of America, supra,* 15 Cal.3d 866, 873-874; *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, 595-597; *Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d 132, 146-149; *Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 447-448 [165 Cal.Rptr. 741]; *Pacific Architects Collaborative* v. *State of California* (1979) 100 Cal.App.3d 110, 118-121 [166 Cal.Rptr. 184]; *McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 81-86 [150 Cal.Rptr. 730];[17] *Garcia* v. *Joseph Vince Co., supra,* 84 Cal.App.3d 868, 873-875 [nonsuit]; *Orsetti* v. *City of Fremont* (1978) 80 Cal.App.3d 961, 966, 971 [146 Cal.Rptr. 75]; *Versa Technologies, Inc.* v. *Superior Court* (1978) 78 Cal.App.3d 237, 240 [142 Cal.Rptr. 570]; *Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 339-340 [138 Cal.Rptr. 670]; *C. L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 741-743 [135 Cal.Rptr. 483]; *Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 171-172 [76 Cal.Rptr. 680]; *DeVault* v. *Logan* (1963) 223 Cal.App.2d 802, 809 [36 Cal.Rptr. 145].)

Plaintiffs rely upon provisions found in the third paragraph of the 1973 revision of Code of Civil Procedure section 437c. They read, "In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the . . . evidence set forth in the papers and all inferences reasonably deducible from such evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Stats. 1973, *supra,* p. 807.)[18]

---

[17]*McCreery* was referred to in the majority and dissenting opinions in *Sindell* (26 Cal.3d at pp. 597 and 615). It has since been cited in the Supreme Court without comment as declarative of one of the rules governing a decision on a motion for summary judgment. (*Brown* v. *Bleiberg, supra,* 32 Cal.3d at p. 438.) In *McCreery,* the court observed, "It is incumbent upon [plaintiff] to show that all manufacturers misrepresented the risks inherent in the use of DES on their applications to the Food and Drug Administration. The record is without any such evidence." (At p. 86.) In *Sindell,* the court was dealing with a complaint that alleged that all manufacturers "produced a defective product with delayed effects and without adequate warnings." (26 Cal.3d at pp. 601, 602, fn. 16 and 603, fn. 18.) We assume *McCreery* is still good law where no showing is made that all manufacturers are tortfeasors.

[18]The deleted word "admissible" was in fact deleted by Statutes 1980, chapter 57, section 1, page 151, and following the phrase "evidence set forth in the papers," the Legislature inserted "except that to which objections have been made and sustained by the court." Those amendments do not apply to this case, because the notices of appeal were filed before

In their opening brief plaintiffs acknowledge that the basis of the trial court's ruling was that there was no triable issue of fact regarding the identity of the tortfeasor or tortfeasors whose conduct had injured them. They urged in confession and avoidance that the market share basis established in *Sindell* and the "enterprise" or "industry-wide" theory permitted suit against all the manufacturers of the Salk vaccine. Faced with the absence of the necessary facts for the application of *Sindell,* and that court's rejection of the "industry-wide" theory, the plaintiffs switched horses in midstream. They ask us to infer from the allegations of the complaint that there are triable issues of fact on causes of action for negligent failure to warn, concert of action and enterprise liability. They assert that they never limited themselves solely to the allegations of a manufacturing defect as the cause of their injuries. They point to allegations that all of the defendant manufacturers violated a duty to see to it that the vaccine was properly prepared, properly marketed, and that proper warning was given.[19]

In *Canifax v. Hercules Powder Co.* (1965) 237 Cal.App.2d 44 [46 Cal.Rptr. 552], the court observed, "[A] plaintiff who has pleaded a cause of action on either of two theories will not be subject to defeat by summary judgment because the defendant has established by an uncontradicted affidavit that *one* of the two theories (but not necessarily the other) cannot be established. The burden is upon defendant to rule out *all possible merit* and, as shown above, the law is exacting in its requirements upon a defendant who seeks to meet that burden." (*Id.,* at p. 50, italics in original; see also *Conn v. National Can Corp.* (1981) 124 Cal.App.3d 630, 639-640 [177 Cal.Rptr. 445]; *Pacific Architects Collaborative v. State of California, supra,* 100 Cal.App.3d 110, 120; *Cox v. State of California* (1970) 3 Cal. App.3d 301, 309 [82 Cal.Rptr. 896]; *Swaffield v. Universal Ecsco Corp., supra,* 271 Cal.App.2d 147, 171.)

In *Canifax,* the court found, as plaintiffs urge here, that there was a duty on the manufacturer to warn of the dangers of the product involved and that that duty was not conclusively rebutted by the record on the matter for summary judgment. (*Id.,* at p. 53.) Here as we have seen, the record fails to show that any defendant individually, or that the defendants collectively produced a product that was improperly prepared, improperly marketed, or so dangerous when properly made that a warning was required. (See *Walker*

---

January 1, 1981. (Stats. 1980, ch. 57, § 2, pp. 151, 152.) We attach no significance to this change in the law, because no questions regarding the admissibility of evidence have been raised on appeal.

[19]We noted above (point III, p. 604) that this attempt to switch theories of the case was attacked by motion which was denied without prejudice. (Cf. 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 442, p. 4405.) As we may, we have elected to consider them. (See *Burns v. Ross* (1923) 190 Cal. 269, 275 [212 P. 17]; Witkin, *op. cit.,* p. 4406.)

v. *Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 674 [96 Cal.Rptr. 803].) In fact the facts we have reviewed are all to the contrary.

The contention that a sufficient pleading raises a triable issue of fact requiring the denial of a motion for summary judgment has been often made and as often rejected. ■ The court must determine whether the triable issues apparently raised by the pleadings are real, or merely the product of adept pleading. (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590, 595-596; *Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d 132, 147-148; *Hooks* v. *Southern Cal. Permanente Medical Group, supra,* 107 Cal.App.3d 435, 442; *Pacific Architects Collaborative* v. *State of California, supra* 100 Cal.App.3d 110, 120; *Orsetti* v. *City of Fremont, supra,* 80 Cal.App.3d 961, 966.)

In short, the pleadings may be resorted to for the purpose of determining the theories on which the plaintiffs seek recovery, but when the record reflects that the facts are insufficient to sustain those theories, the mere allegations cannot raise a triable issue of fact to defeat the motion for summary judgment.

Recent cases on product liability do not aid plaintiffs. *Miles Laboratories, Inc.* v. *Superior Court* (1982) 133 Cal.App.3d 587 [184 Cal.Rptr. 98] (request for hearing *sua sponte* and/or an order directing nonpublication denied Sept. 15, 1982), tends to support plaintiffs' claim that a summary judgment is improper where allegations of the complaint reflect potential liability and are not fully controverted by the showing on the motion. There the manufacturers attempted to take advantage of the invitation in *Sindell* (26 Cal.3d at p. 612), to show that it was not in the group which could have furnished the DES that caused plaintiff's injuries because it never manufactured or distributed its product for treatment of the complications of pregnancy. (133 Cal.App.3d at p. 594.) The court found that the issues of whether the product was actually used for that purpose with the knowledge of the defendant, and whether it was properly labeled to foreclose such use were still open. (*Id.,* at pp. 594-596; but cf. Kaufman, J., dis. at pp. 596-600.) Here the record reflects that the vaccine generally distributed by the defendants was fit for the use it was made.

Similarly in *Pereira* v. *Dow Chemical Co.* (1982) 129 Cal.App.3d 865 [181 Cal.Rptr. 364], the court overturned a summary judgment against the manufacturers of dangerous chemicals to which the plaintiff had been exposed at his place of employment. Since the record reflected that all were tortfeasors, the court applied *Summers* v. *Tice* to shift the burden to the defendants to identify the defective dangerous substance or substances that

caused plaintiff's chronic renal failure. (*Id.*, at pp. 871-873.) In this case the record only reflects one defective and dangerous product.

The judgments are affirmed.

White, P. J., and Feinberg, J., concurred.