Lesta MORRIS and Eddie Morris, individually, and David Kent Morris, by his co-conservators, Lesta and Eddie Morris, Plaintiffs,

v.

PARKE, DAVIS & COMPANY, a corporation; Wyeth Laboratories, a division of American Home Products Corporation, a division of American Cyanamid Company; Eli Lilly and Company; the National Drug Company, a division of Richardson-Merrell, Inc., Defendants.

No. CV 82–5296–RJK (JRx).

United States District Court,
C.D. California.

June 12, 1987.

See also 573 F.Supp. 1324.

Andrew W. Dodd, Denver & Dodd, Torrance, Cal., for plaintiffs.

Joann M. Zaleskas, Haight, Dickson, Brown & Bonesteel, Santa Monica, Cal., Timothy Bradford, Morgan, Wenzel & McNichol, Charles Smith, Lord, Bissel & Brook, Jeffrey Barron, Morris, Polich & Purdy, Los Angeles, Cal., Peter Hast, Hast & Sabatasse, Van Nuys, Cal., Phillip S. Berry, Carolyn Collins, Berry & Berry,

**1334**

Oakland, Cal., Harvey Kaplan, Shook, Hardy & Bacon, Kansas City, Mo., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

### I. INTRODUCTION

This is an action against five vaccine manufacturers in which plaintiffs allege that plaintiff David Morris was injured as the result of the administration of Diptheria-Pertussis-Tetanus vaccine ("D.P.T.") during 1965. Plaintiffs concede their inability to identify the manufacturer of the particular vaccine administered to plaintiff David Morris. As a result, they have chosen to proceed on the market share liability theory first delineated in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).

Defendant Parke, Davis & Company ("defendant Parke") moves the Court for partial summary judgment on plaintiffs' claims based on an alleged manufacturing defect. All of the remaining defendants joined in said motion by filing appropriate notices of joinder.

Defendant Eli Lilly & Company ("defendant Lilly") moves the Court for partial summary judgment on plaintiffs' second and third causes of action for breach of express and implied warranty, respectively. Defendants Parke, Lederle Laboratories, and National Drug Company joined in said motion by filing appropriate Notices of Joinder. The remaining defendant, Wyeth Laboratories, joined in said motion by oral notice of counsel during the February 2, 1987, hearing on the pending matters.

### II. ANALYSIS

#### A. MANUFACTURING DEFECT.

##### 1. DEFINITION OF "MANUFACTURING DEFECT".

At least two different theories have been held to satisfy the "defect" prerequisite to the finding of strict liability in tort: the "manufacturing defect" theory and the "design defect" theory. *Barker v. Lull Engineering Company, Inc.*, 20 Cal.3d 413, 429, 143 Cal.Rptr. 225, 236, 573 P.2d 443, 454 (1978). By Order entered on September 20, 1985, this Court determined that plaintiffs could not proceed on a design defect theory of strict product liability.[1] Therefore, it is crucial for the purpose of deciding the present motion to distinguish the concept of "manufacturing defect" from the concept of "design defect."

1. By Order entered on September 20, 1985, the Court determined that: (a) Restatement (Second) of Torts, section 402A comment k applied to this action; and (b) that plaintiffs could not proceed on a design defect strict liability theory. At the time the law on this issue was well settled. However, the Court notes that the automatic application of comment k to vaccine and prescription drug cases, and the resulting foreclosure of design defect strict liability has now been called into question by at least one intermediate California Court of Appeals. *See: Kearl v. Lederle Laboratories*, 172 Cal.App.3d 812, 829, 218 Cal.Rptr. 453, 463 (1 Dist.1985) ("In our view, the decision as to whether a drug, vaccine, or any other product that triggers unavoidably dangerous product exemption from strict liability design defect analysis poses a mixed question of law and fact and can be made only after evidence is first taken, out of the jury's presence, on the relevant factors."). However, *Kearl* was totally rejected by a court in the same appellate district in *Brown v. Superior Court (Abbott Laboratories)*, 192 Cal.App.3d 150, 227 Cal.Rptr. 768, 775 (Cal.App. 1 Dist.1986),

*review granted*, 229 Cal.Rptr. 663 (Cal.1986). A later decision, while more sympathetic to the concerns voiced in *Kearl*, held that where, as here, the product that allegedly caused a plaintiff's injury is a prescription product which is distributed with the approval of the FDA, the product must be considered unavoidably unsafe as a matter of law and thus outside the parameters of strict liability for defective design. *Collins v. Ortho Pharmaceutical Corporation*, 231 Cal.Rptr. 396, 404 (Cal.App. 5 Dist.1986), *review granted*, 234 Cal.Rptr. 596, 732 P.2d 542 (Cal. 1987). Thus, the Court does not perceive any need to reexamine its prior ruling on this matter at this time.

The court recognizes that the issues concerning the application of comment k and the availability of the design defect theory of strict liability in drug and vaccine cases is now before the California Supreme Court in both *Brown* and *Collins*. Thus, what was once well settled could become unsettled very quickly. The Court trusts that the parties will keep the Court informed regarding any further developments in the law before this case comes to trial.

■ A product has a "manufacturing defect" if and only if the product caused a plaintiff's injury because it deviated from the manufacturer's intended result[2] or from other ostensibly identical units of the same product line. *Barker,* 20 Cal.3d at 429, 143 Cal.Rptr. at 236, 573 P.2d at 454. For example, when a product comes off the assembly line in a substandard condition, it has incurred a manufacturing defect. *Id.* A manufacturing defect is one which results from an error in the production process. *Finn v. G.D. Searle & Co.,* 35 Cal.3d 691, 715, 200 Cal.Rptr. 870, 886, 677 P.2d 1147, 1163 (1984) (Bird, C.J., dissenting).

■ In contrast, in the case of a design defect the injury producing agent is common to all products of a certain line, and the defect lies in the original design or model. *Finn,* 35 Cal.3d at 691, 200 Cal. Rptr. at 886, 677 P.2d at 1163 (Bird, C.J., dissenting). A product has a design defect if and only if: (a) the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably expected manner[3], or (b) the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. *Barker,* 20 Cal.3d at 432, 435, 143 Cal.Rptr. at 237–238, 239–240, 573 P.2d at 466–47, 468–69.

### 2. SUBSTANCE OF THE MOTION RE: MANUFACTURING DEFECT.

Defendants contend that the Court should grant their motion for partial sum-

---

**2.** This prong of the alternate *Barker* manufacturing defect test provides little guidance where, as here, it is crucial to distinguish between the concepts of "design defect" and "manufacturing defect." This is because, to anticipate a little, a product with a design defect could deviate from the manufacturer's intended or anticipated result. It appears that the fundemental characteristic of a product with a manufacturing defect is that it differs form other ostensibly identical units of the same product line.

**3.** This prong of the alternate *Barker* design defect test also provides little guidance where, as here, it is crucial to distinguish between the concepts of "design defect" and "manufacturing

---

mary judgment on plaintiffs' manufacturing defect theory for four (4) reasons. Defendants contend that plaintiffs: (a) are foreclosed from proceeding on said theory because of this Court's Order entered on September 20, 1985, that Restatement (Second) of Torts, section 402A comment K applies to this action; (b) are foreclosed from proceeding on said theory because of this Court's Order entered on September 20, 1985, finding that there is a "congressional intent to occupy the field"; (c) cannot, as a matter of law, proceed on a manufacturing defect theory in this, a *Sindell* market share liability case; and (d) have no evidence to support their allegation that the D.P.T. administered to Plaintiff David Morris had a manufacturing defect.

### a. RESTATEMENT (SECOND) OF TORTS, SECTION 402A COMMENT K.

As noted above, by Order entered on September 20, 1985, the Court determined that Restatement (Second) of Torts, section 402A comment k applies to this action. Said Order noted parenthetically that a drug manufacturer lost its comment k protection if the drug at issue was not accompanied by the proper directions and warnings. From this, defendants argue that plaintiffs are limited to a failure to warn theory of recovery. Said argument is specious.

■ Restatement (Second) of Torts, section 402A comment k provides in pertinent part:

defect." This is because a product may fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably expected manner (first prong of the alternative design defect test) *because* it deviated from the manufacturer's expected result or from other ostensibly identical units in the same product line (manufacturing defect test). Thus, it would be more precise to say that a product that satisfies only the first prong of the *Barker* design defect test has a design defect only if it does not also satisfy the manufacturing defect test. The Court will adopt the procedure of applying both tests.

"k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vacine are fully justified, notwithstanding the unavoidable high degree of risk which they impart. Such a product, *properly prepared,* and accompanied by proper directions and warnings, is not defective, nor is it unreasonably dangerous. * * * It is also true in particular of many new experimental drugs.... The seller of such products, *again with the qualification that they are properly prepared and marketed* ... is not to be held to strict liability for unfortunate consequences attending their use...."

(Emphasis added.) Comment k's protection is expressly conditioned by the requirement that the drug be "properly prepared and marketed"; i.e., that it not have a manufacturing defect. A drug that has a manufacturing defect is, by definition, not "unavoidably unsafe."

b. PREEMPTION.

As noted above, by Order entered on September 20, 1985, the Court determined that the testing requirements for D.P.T. mandated by the Public Health Service Act, 42 U.S.C. section 201 et seq., and the regulations promulgated thereunder evidence Congressional intent to occupy this field. Thus, the Court granted defendant Lilly's motion for summary adjudication on the issue of federal preemption. Defendants contend that said Order forecloses plaintiffs from proceeding on a manufacturing defect theory.

■ Defendants' contention has led the Court to reexamine its prior decision on the preemption issue in light of: (i) *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707,

105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); and (ii) the National Childhood Injury Act of 1986. The Court recognizes that its prior ruling is interlocutory in character and is subject to change at any time until entry of judgment. *See:* 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice,* para. 0.404[4.–1], pgs. 124–126 (2nd ed. 1948); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* section 4477, pgs. 788–792 (1981). Moreover, the Court has broad discretion to reconsider its prior rulings. *Id.* The law of the case doctrine serves as a guide to the Court in exercising its discretion in this area, but in no way limits the power of the Court to reconsider its prior rulings under these circumstances. *Id.*

(i) HILLSBOROUGH v. AUTOMATED MEDICAL LABORATORIES, INC.

In *Hillsborough* the defendant county adopted two ordinances and implementing regulations governing plasmaphersis centers within the county. *Hillsborough,* 105 S.Ct. at 2373. Said county ordinances and regulations: (a) imposed a $225 license fee on plasmapheresis centers; (b) required such centers to allow the county reasonable and continuing access; (c) required potential donors to obtain a county identification card at a fee of $2; (d) established a county fee of $1 for each plasmapheresis procedure performed; and (e) imposed testing and recordkeeping requirements beyond those contained in the federal regulations. *Hillsborough,* 105 S.Ct. at 2373–2374. The additional testing and recordkeeping requirements included: (i) a pre-registration hepatitus test; (ii) a pre-donation alcohol breath analysis test; and (iii) the requirement that donors donate at only one center. *Id.*

Like defendants in the present case, the plaintiff plasma center in *Hillsborough:* (1) had to be licensed by the Secretary of Health and Human Services pursuant to 42 U.S.C. section 262(a); (2) could obtain the required license only on a showing that the vendor's establishment and products met certain safety, purity, and potency standards established by the Secretary pursu-

ant to 42 U.S.C. section 262(d); and (3) was subject to inspection pursuant to 42 U.S.C. section 262(c). *Hillsborough*, 105 S.Ct. at 2373. As in the present case, the implementing federal regulations in *Hillsborough* were set forth in Title 21 of the Code of Federal Regulations, Subchapter F (Biologics). *Id.*; *See also:* 21 C.F.R. 601.1–601.9 (Licensing), 620.1–620.6 (Additional standards for pertussis vaccine.), 640.60–640.76 (Source plasma.) (1986).

The plaintiff plasma center filed suit in Federal District Court, challenging the constitutionality of the ordinances and implementing regulations on the ground, *inter alia,* that they violated the Supremacy Clause. *Hillsborough*, 105 S.Ct. at 2374. The District Court upheld all portions of the local ordinances and regulations except the requirement that donors be subject to a breath analysis test. *Id.* The Court of Appeals held that the regulations promulgated by the Food and Drug Administration ("FDA") preempted all provisions of the defendant's ordinances and regulations. *Id.*

A unanimous Supreme Court reversed the decision rendered by the Court of Appeals and held that the county ordinances and their implementing regulations were not preempted by the federal regulation of plasmapheresis. *Hillsborough*, 105 S.Ct. at 2380.

The Supreme Court initially rejected the argument that an intent to preempt could be inferred from the comprehensiveness of the FDA's regulations. The Court noted that (unlike the present case) the FDA stated that it did not intend its regulations to be exclusive when it promulgated same in 1973. *Hillsborough*, 105 S.Ct. at 2375. However, the Court went on to state that *"even in the absence of the 1973 statement, the comprehensiveness of the FDA's regulations would not justify preemption. Hillsborough, 105 S.Ct. at 2377* (emphasis added). The Court recognized that:

> Where ... the field Congress is said to have pre-empted has been traditionally occupied by the States "we start with the assumption that the historic police pow-

ers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Hillsborough*, 105 S.Ct. at 2376 (citations omitted). The Court reasoned that the subjects of modern social and regulatory legislation often by their very nature require intricate and complex respnses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem. *Hillsborough*, 105 S.Ct. at 2377. Merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States are barred from identifying additional needs or imposing further requirements in the field. *Id.* The Court further explained:

> We are even more reluctant to infer preemption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.

*Id.* Perhaps most importantly, the Supreme Court stated:

> Mooreover, because agencies normally address problems in a detailed manner and can speak through a variety of means ... we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to preempt. *Given the presumption that state and local regulation related to matters of health and safety can normally coexist with federal regulations, we will seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empty in its*

*entireity a field related to health and safety.*

*Id.* (emphasis added); *Accord: Siuslaw Concrete Construction Company v. State of Washington, Department of Transportation,* 784 F.2d 952, 957 (Action involving preemption challenge to state law providing a minimum wage rate for nonapprentice trainees on federally funded highway contruction projects higher than that allowed under federal statutes and regulations. "Thus, given the *Hillsborough* Court's statement ... this court will not infer a federal intent to preempt state requirements in this area from a regulation that does not specifically address the issue.").

The Supreme Court next rejected the argument that an intent to preempt could be inferred from the allegely dominant federal interest in the field. The Court reasoned:

> Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law.

*Hillsborough,* 105 S.Ct. at 2378. The standards for deciding whether the federal interest in a field is dominant are established by case law recognizing the federal dominance in such areas as foreign affairs, etc. *Id.* The Court again stressed that "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* (citation omitted).

Finally, the Supreme Court rejected the argument that even if the entire field of plasmapheresis regulation was not preempted, the county ordinances had to be struck down because they conflicted with the federal scheme's purpose of ensuring an adequate supply of plasma. *Hillsborough,* 105 S.Ct. at 2379. The Court rejected this argument for two separate reasons. First, the Court found the plaintiff plasma center's predictions regarding the effect the county ordinances and regulations would have on the supply of plasma too speculative to support preemption. *Hillsborough,* 105 S.Ct. at 2379. Secondly, the Court reasoned that even if the county

ordinances reduced the supply of plasma, it would not necessarily follow that they would interfere with the federal goal of maintaining an adequate supply of plasma. *Id.* This was because neither Congress nor the FDA had struck a particular balance between safety and quantity. *Id.*

This Court believes it is bound by the decision in *Hillsborough* for the following reasons.

With regard to the argument of preemption by federal regulation, the *Hillsborough* decision addresses the same statute and subchapter of the Code of Federal Regulations as involved herein. Moreover, it appears that the D.P.T. regulations are no more extensive than those for blood plasma. *Compare:* 21 C.F.R. 620.1–620.6 (Additional standards for pertussis vaccine.) *to* 21 C.F.R. 640.60–640.76 (Source Plasma.) (1986). Furthermore, the Court observes that with respect to the application of the Supreme Court's observation that "we can expect that [administrative agencies] will make their intentions clear if they intend for their regulations to be exclusive" to the facts of the present case: (a) the first licensing regulation applicable to the producers of biological products was adopted on January 21, 1947[4]; (b) to date the licensing and minimum biological product standard regulations have been amended, renumbered, or otherwise republished, in whole or in part, numerous times; and (c) the agency has never indicated that its regulations should be exclusive.

With regard to the argument that state tort remedies have been preempted because of the allegedly dominant federal interest in the area of vaccine regulation, the Court notes that, like the area of blood plasma involved in *Hillsborough,* the area of vaccines concerns the regulation of health and safety matters that is primarily, and historically, a matter of local concern.

Finally, the Court notes that, at least until recently (see next section below), there has been no evidence that either Congress or the FDA had struck a particular balance between the supply and quality of

**4.** *See:* 12 Fed.Reg. 411 (1947).

vaccines. Moreover, any determination regarding the effect state tort judgments have on the supply and cost of vaccines would both be based on speculation and beyond the province of this Court (again, see next section below).

In summary, in *Hillsborough* the Supreme Court rejected not only the basis for this Court's prior ruling on this matter, but also all of the preemption arguments upon which Defendants rely.

#### (ii) NATIONAL CHILDHOOD VACCINE INJURY ACT OF 1986.

Congress recently enacted the National Childhood Vaccine Injury Act of 1986 ("the Act"). Pub.L. No. 99–660, sections 301–323, 100 Stat. 3743, 3755–3784 (1986). The Act creates, *inter alia,* a National Vaccine Injury Compensation Program ("the Program"). *See:* Pub.L. No. 99–660, section 311, 100 Stat. at 3758–3779. The pertinant portions of the Program are codified at 42 U.S.C. sections 300aa–1 to 300aa–33. The Program does not apply where, as here, the injured party was injured by a vaccine more than eight (8) years prior to the Act's date of enactment, November 14, 1986. 42 U.S.C. 300aa–16(b)(1); *See also:* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess., 13, 22–23, *reprinted in,* 1986 U.S.Code Cong. & Admin.News, 6344, 6354, 6363–6364. Moreover, the Act does not effect the legal rights or remedies of such a party. *See:* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess., at 13, *reprinted in,* 1986 U.S.Cong. Code & Admin.News at 6354. However, the Act's provisions and legislative history are both instructive.

In its report on H.R. 5546, 99th Cong., 2d Sess. (1986), the bill that was eventually enacted as the National Vaccine Injury Compensation Program, the House Committee on Energy and Commerce stated:

> [F]or the relatively few who are injured by vaccines—through no fault of their own—the opportunites for redress and restitution are limited, time-consuming, expensive, and often unanswered. *Currently, vaccine-injured persons can seek recovery for their damages only through the civil tort system or through a settlement arrangement with the vaccine manufacturer.*

H.R.Rep. No. 99–908, 99th Cong., 2nd Sess., at 6, *reprinted in,* 1986 U.S.Code Cong. & Admin.News, at 6347 (emphasis added). Said statement clearly evidences the Committee's recognition that state tort remedies had not previously been preempted by federal legislation or the regulations adopted pursuant thereto.

The Act not only recognizes the prior validity of state tort law in the area of vaccine related injuries, but also expressly contemplates the continuing validity of such law. This conclusion is supported by the portion of the Act newly codified as 42 U.S.C. section 300aa–22. Subsection (a) of said section provides:

> Except as provided in subsections (b), (c), and (e) of this section *State law shall apply to a civil action brought for damages for a vaccine-related injury.*

(emphasis added). Subsection (b) provides, *inter alia,* that no vaccine manufacturer shall be held liable for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after the Act's effective date if the injury or death "resulted from side effects that were unavoidable *even though the vaccine was properly prepared and was accompanied by proper directions and warnings."* (emphasis added). Subsection (c) forecloses liability arising from vaccine-related injury or death solely due to the manufacturer's failure to provide direct warnings to the injured party or his legal representative (as opposed to the party's physician) of the vaccine's potential dangers. It is interesting to note that both the "manufacturing defect" and basic "failure to warn the learned intermediary" theories of strict liability fall outside the scope of subsections (b) and (c). Most interestingly, subsection (e) provides:

> *Preemption*—No State may establish or enforce a law which prohibits an individual from bringing a civil action against a vaccine manufacturer for damages for a vaccine-related injury or death if such civil action is *not* barred by this part.

(emphasis added). When discussing the part of the Act that would be codified as 42 U.S.C. section 300aa–22, the House Committee on Energy and Commerce observed:

This section establishes certain standards of responsibility with respect to civil actions brought for damages for vaccine-related injuries or death. *In some cases, the standards will be the same or similar to existing state law; in others, the standards will change most State laws.* The Committee believes that the establishment of these standards of responsibility is appropriate in light of the availability of a comprehensive and fair compensation system. *However, the establishment of these standards are the only new requirements that affect state law regarding actions for vaccine-related injuries or death; all other aspects of State law remain unchanged.*

H.R.Rep. No. 99–908, 99th Cong., 2nd Sess., at 25, *reprinted in,* 1986 U.S.Code Cong. & Admin.News, at 6366 (emphasis added). Both 42 U.S.C. section 300aa–22 and the Committee's comment thereon are clearly based upon the understanding that state law had not previously been, and would not be, preempted by the pertinant federal statutes and regulations except as expressly provided.

Finally, if there remains any doubt, the Act recognizes not only the continuing validity of state law in actions arising out of vaccine related injuries, but also contemplates the continuing litigation of such actions in the state courts. Under 42 U.S.C. section 300aa–11(a)(5) a person who was injured less than eight (8) years prior to the Act's date of enactment, and who has an action pending on said date may, at his option, either: (a) elect to withdraw such action without prejudice and file a petition for compensation under the Act; or (b) proceed with said action. *See also:* H.R. Rep. No. 99–908, 99th Cong., 2nd Sess., at 13–14, *reprinted in,* 1986 U.S.Code Cong. & Admin.News, at 6354–6355. Moreover, under 42 U.S.C. section 300aa–11(a)(2)(A) a person who is injured by a vaccine administered after the Act's date of enactment may proceed with a state court action after: (i) he has filed a petition for compensa-

tion under the Act with the appropriate District Court; (ii) the District Court has issued judgment on said petition; and (iii) he has elected in writing not to accept the judgment and to file a civil action for damages. *See also:* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess., at 14, *reprinted in,* 1986 U.S.Code Cong. & Admin.News, at 6355.

In short, both the provisions and the legislative history of the Act clearly establish that the state tort remedies for vaccine-related injuries had not previously been preempted by the pertinant federal regulations, and would be preempted in the future only to the extent that Congress expressly provided.

(iii) CONCLUSION.

In conclusion, the Court now holds that plaintiffs' claims are not preempted by federal law. Thus, plaintiffs are not foreclosed from proceeding on a manufacturing defect theory on said ground.

c. THE USE OF A MANUFACTURING DEFECT THEORY IN A SINDELL MARKET SHARE LIABILITY CASE.

Defendants contend that under *Sheffield v. Lilly,* 144 Cal.App.3d 583, 192 Cal.Rptr. 870 (1983), the *Sindell* market share liability theory does not apply to any case where the injury was caused by a manufacturing defect which was not present in the products of all of the defendant manufacturers. Defendants are correct.

In *Sindell* the plaintiff's injuries were caused by an inherently carcinogenic and ineffective drug, diethylstilbesterol ("DES"). *Sindell,* 26 Cal.3d at 593–594, 163 Cal.Rptr. at 133, 607 P.2d at 925. During the period the defendant manufacturers marketed DES, they already knew or should have known that there was a grave danger that it would cause cancerous and precancerous growths, and that it was ineffective. *Sindell,* 26 Cal.3d at 594, 163 Cal. Rptr. at 133–134, 607 P.2d at 925–926. Nevertheless, the defendant manufacturers allegedly continued to advertise and market the drug on an unlimited basis in viola-

tion of the FDA's authorization for experimental use only. *Sindell*, 26 Cal.3d at 594, 163 Cal.Rptr. at 134, 607 P.2d at 926. The plaintiffs, through no fault of their own, could not identify the specific manufacturer of the DES that was administered to the injured party. *Sindell*, 26 Cal.3d at 595–596, 163 Cal.Rptr. at 134, 607 P.2d at 926. The Court held that if the plaintiff joined in the action the manufacturers of a substantial share of the DES which might have been administered, then each defendant would be held liable for the proportion of the judgment represented by its share of the market, unless it establishes that it could not have made the product which caused the plaintiff's injuries. *Sindell*, 26 Cal.3d at 612, 163 Cal.Rptr. at 145, 607 P.2d at 937.

The *Sindell* Court did not expressly classify DES as having a design, as opposed to a manufacturing defect. However, it is clear that the DES involved in *Sindell* had a design defect.[5] DES satisfies both of the alternative *Barker* tests for a design defect. First, DES failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably forseeable manner. *See: Barker*, 20 Cal.3d at 435, 143 Cal.Rptr. at 237–238, 573 P.2d at 455–56. Secondly, the design of DES proximately caused the plaintiff's injuries, and the defendants were unable to establish that the benefits of DES' design

outweighed the risk of danger inherent in such design. *See: Barker*, 20 Cal.3d at 432, 143 Cal.Rptr. at 238, 573 P.2d at 456. Unlike a manufacturing defect, DES did not cause the plaintiff's injuries because it deviated from other ostensibly identical units. *See: Barker*, 20 Cal.3d at 429, 143 Cal.Rptr. at 236, 573 P.2d at 454.

In *Sheffield*, like *Sindell*, the plaintiffs could not, allegedly through no fault of their own, identify the specific manufacturer of the defective vaccine that was administered to the injured party. *Sheffield*, 144 Cal.App.3d at 593–594, 192 Cal.Rptr. at 876. Also like *Sindell*, in *Sheffield* the defendant manufacturers were making a generic pharmaceutical product according to a uniform formula. *Sheffield*, 144 Cal. App.3d at 544, 192 Cal.Rptr. at 876. However, unlike *Sindell*, the vaccine involved in *Sheffield* had a manufacturing defect: it caused the plaintiff's injuries because it deviated from otensibly identical units. *See: Sheffield*, 144 Cal.App.3d at 594, 192 Cal.Rptr. at 876; *See also: Barker*, 20 Cal.3d at 429, 143 Cal.Rptr. at 236, 573 P.2d at 454.

This distinction is critical. In *Sindell* all of the defendants' DES products were defectively, and indeed negligently, designed and marketed. Thus, the *Sindell* Court was solely concerned with the issues of actual and proximate causation.[6] The

---

**5.** The *Sindell* court did not address the issue regarding the application of Restatement (Second) of Torts, section 402A comment k. However, it is clear that the *Sindell* defendants had lost their comment k protection. As described in greater detail in section II. A.2.a., *supra*, comment k's protection is expressly conditioned by the requirement that the drug be properly marketed and that it be accompanied by proper warnings. The *Sindell* defendants failed to satisfy either requirement. They marketed the drug in violation of the applicable FDA restrictions and failed to warn of known or reasonably knowable dangers.

**6.** More precisely, the *Sindell* court split the issue of causation down the middle by relying upon the conceptual distinction between a given "defect" and the product or products which contain or are subject to that defect. *Sindell* involved an appeal from a trial court order sustaining a demurrer and dismissing the complaint because the plaintiff could not identify the manufacturer of the DES that was actually administered. *Sin-*

*dell*, 26 Cal.3d at 595–596, 163 Cal.Rptr. at 134, 607 P.2d at 926. The trial court did not reach the other issues raised by the complaint. *Sindell*, 26 Cal.3d at 596 n. 3, 163 Cal.Rptr. at 134–135 n. 3, 607 P.2d at 926–27 n. 3. Thus, the court assumed for the purpose of deciding the appeal that a DES *defect* actually and proximately caused the injuries, even though plaintiff admitted her inability to establish which DEs *product* (subject to the defect) caused the injuries. *Compare Sindell*, 26 Cal.3d at 594–595, 163 Cal.Rptr. at 134, 607 P.2d at 926 ("*As a result* of the DES ingested by her mother, plaintiff developed a malignant bladder tumor....") *with Sindell*, 26 Cal.3d at 595–596, 163 Cal.Rptr. at 134, 607 P.2d 926 (Plaintiff could not identify "the manufacturer of the precise drug ingested by her mother....").

The distinction is both subtle and critical. *Sindell* does *not* relieve a plaintiff of the burden of establishing: (a) that an identifiable *defect* caused his injury; *and* (b) that a given defendant's product was subject to said defect. *Sindell*

*Sheffield* Court recognized that nothing in *Sindell* suggests that the costs of injury should be assessed against a manufacturer whose product is not harmful or defective. *Sheffield,* 144 Cal.App.3d at 595, 192 Cal. Rptr. at 877. Thus, the *Sheffield* Court held that the *Sindell* market share liability theory did not apply to the facts before it. *Sheffield,* 144 Cal.App.3d at 599, 192 Cal. Rptr. at 880.

Although the Court agrees with defendants' charaterization of the holding in *Sheffield,* the Court rejects their conclusion that *Sheffield* necessarily prevents plaintiffs from proceeding on a manufacturing defect theory.

Plaintiffs contend that they fall outside the scope of *Sheffield,* and that *Sindell* controls because plaintiff David Morris' injury was caused by a manufacturing defect which *was* present in all of the defendants' D.P.T. products. Said contention is based upon plaintiffs' allegations that defendants' respective D.P.T. products, and each of them, "shared common inadequacies" in manufacturing, testing, storage and marketing.

Plaintiffs' legal theory is correct. The *Sheffield* Court expressly based its holding that the *Sindell* market share liability theory did not apply upon two factors: (a) the assumption that only one manufacturer produced the vaccine that had the manufacturing defect; and (b) the resulting unfairness of imposing the costs of injury against a manufacturer whose product is not harmful. *Sheffield,* 144 Cal.App.3d at 594–595, 599, 192 Cal.Rptr. at 876–877, 880; *see also: Pena v. W.H. Douthitt Steel & Supply Co.,* 179 Cal.App.3d 924, 929–930, 225 Cal.Rptr. 76, 79 (1986) ("*Sheffield* held that the *Sindell* theory did not apply unless the plaintiff could show that all defendants acted tortiously, i.e., manufactured the same defective product.").

■ Assuming for the purpose of determining the validity of plaintiffs' legal theo-

ry that their allegations are true, neither such factor is present in this case. There is no unfairness [7] in holding a given defendant manufacturer liable for the proportion of a judgment represented by its share of the market when: (a) the plaintiff establishes that (i) his injuries were caused by a particular product defect or combination of defects, (ii) the product marketed by the given defendant manufacturer had said defect of combination of defects, (iii) he has joined in the action the manufacturers of a substantial share of the product; *and* (b) the given manufacturer fails to establish that it could not have made the product which caused the plaintiff's injuries. *See: Sindell,* 26 Cal.3d at 594, 611–613, 163 Cal. Rptr. at 135, 144–146, 607 P.2d at 936–937. It is irrelevant under such circumstances whether the defect which caused the plaintiff's injuries is common to the products of all the defendant manufacturers because it was a design defect or because it was a manufacturing defect resulting from common (perhaps for reasons of economy) substandard means of production, storage, transportation, or marketing. Conversely, unlike the case in *Sheffield,* the plaintiffs will have established that each defendant held liable for its "market" share of the judgment acted tortiously; i.e., manufactured a defective product that could have caused plaintiff David Morris' injury. *See: Sheffield,* 144 Cal.App.3d at 594–595, 599, 192 Cal.Rptr. at 876–877, 880; *See also: Pena v. W.H. Douthitt Steel & Supply Co.,* 179 Cal.App.3d at 929–930, 225 Cal. Rptr. at 79.

■ It is, however, important to recognize a critical procedural and evidentiary distinction between *Sindell* and the present case.[8] In *Sindell* it could not be contested that the DES products of each defendant manufacturer had the injury causing defect because said defect was inherent to DES; i.e., a design defect. Such is not the case here. In order to recover damages from a

---

only shifts the burden of a given defendant to establish that its (defective) *product* was not administered to or ingested by the injured party, thus causing the latter's injuries.

**7.** Or at least no more unfairness than the California Supreme Court was willing to accept in *Sindell* in order to further other policies.

**8.** *See also:* Note 6, *supra.*

given defendant in the present case, plaintiffs bear the initial burden of proving that the D.P.T. said defendant manufactured *might* have caused plaintiff David Morris' injuries; i.e., that said D.P.T. had the *same* defect as that which caused his injuries. This is necessary in order to satisfy the requirement that said defendant acted tortiously. *See: Sheffield,* 144 Cal.App.3d at 594–595, 599, 192 Cal.Rptr. at 876–877, 880; *Pena v. W.H. Douthitt Steel & Supply Co.,* 179 Cal.App.3d at 929–930, 225 Cal. Rptr. at 79. This is also necessary in order to justify shifting the burden of proof to each defendant to prove that it could not have made the vaccine that was in fact administered to plaintiff David Morris, causing his injuries. *See: Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 684, 221 Cal.Rptr. 447, 455, 710 P.2d 247, 255 (1985) ("[In Sindell we] held that if the plaintiff joined in the action the manufacturers of a substantial share of the DES *which her mother might have taken,* the injustice of shifting the burden of proof to defendants to exonerate themselves would be significantly diminished."); *Sindell,* 26 Cal.3d at 612, 163 Cal.Rptr. at 145, 607 P.2d at 937 ("If the Plaintiff joins in the action the manufacturers of a substantial share of the DES *which her mother might have taken,* the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished."). Thus, in order to recover against a given defendant, plaintiffs must initially prove as a part of their above-described *prima facie* case that: (i) a particular D.P.T. defect or combination of defects caused David Morris' injuries; and (ii) the given defendant's D.P.T. had the same defect or combination of defects. Plaintiffs' failure to discharge said burden of proof against a given defendant neces-

sarily means that the action against said defendant must be dismissed. The plaintiffs will be able to proceed against those defendants against whom they have discharged said burden of proof.[9] Conversely, once plaintiffs have established their *Sindell prima facie* case, the burden shifts to each defendant to prove that it could not have produced the particular D.P.T. product that was in fact administered to plaintiff David Morris.[10]

### d. STATE OF THE EVIDENCE.

Plaintiffs oppose defendants' contention that they have no evidence to support their claim on two different grounds. First, plaintiffs argue that defendants failed to discharge their initial burden of production on their motion because the deposition of plaintiffs' principal expert on the liability issues, Michael M. Lubran, M.D., Ph.D., is still pending and defendants have made no attempt to reconvene same. Secondly, plaintiffs submitted five (5) exhibits which they contend create a material issue of fact regarding the existence of a manufacturing defect. Each of these sub-issues is discussed below.

### (i) THE MOVING PARTY'S INITIAL BURDEN OF PRODUCTION ON A MOTION FOR SUMMARY JUDGMENT.

The leading case on summary judgment in the context of an alleged failure to produce evidence in suport of a claim is *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* a wrongful death action, the District Court granted the defendant's motion for summary judgment because the plaintiff was unable to produce any evidence in support of her allegation that the decedent

---

**9.** This is true at least so long as the remainding defendant manufacturers together continue to make up a "substantial share" of the market. It appears that to date no court has been faced with the issue of what, if anything, to do when manufacturers making up an *insubstantial* share of the market remain after: (a) the plaintiff initially joined in the action manufacturers making up a substantial share of the market; but (b) various defendant manufacturers are

dismissed either (i) as a result of settlement or (ii) on the merits.

**10.** Assuming a given defendant discharges its burden of persuasion on this issue, plaintiffs will be able to proceed against the remaining defendants at least so long as they together continue to make up a "substantial share" of the market. *See:* note 9, *supra.*

had been exposed to the defendant's asbestos products, the alleged cause of the death. *Celotex*, 106 S.Ct. at 2551. A divided panel for the Court of Appeals for the District of Columbia reversed, holding that the defendant's failure to support its motion with evidence tending to negate the possibility of such asbestos exposure precluded the entry of summary judgment. *Id.* On appeal, a five Justice majority of the United States Supreme Court reversed the decision rendered by the Court of Appeals and held:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue of material fact", since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment is a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 106 S.Ct. at 2552–2553. The Supreme Court went on to explain:

> [U]nlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.

*Celotex*, 106 S.Ct. at 2553 (Emphasis in original.). The Court further exlained:

> [T]he burden on the moving party may be discharged by "showing"—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case.

*Celotex*, 106 S.Ct. at 2554.

Most importantly for the purspose of deciding the sub-issue before this Court, the Supreme Court observed that:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the court of the basis of its motion, *and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.*

*Celotex*, 106 S.Ct. at 2553 (Emphasis added.). This last quotation implies, but does not expressly provide, that the moving party must first depose the nonmoving party's witnesses and obtain production of the said party's evidentiary documents in order to discharge its initial burden of "identifying those portions of the ... depositions, answers to interrogatories, and admissions on file which ... demonstrate[ ] the absence of a genuine issue of material fact." Unfortunately, the majority opinion in *Celotex* does not clarify the law on this preliminary issue. *See: McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 800 F.2d 1208, 1213 n. 4 (D.C.Cir.1986) ("There appears to be some question over whether this burden is discharged by a bare allegation that the plaintiff has insufficient evidence to get to the jury, or whether something more, such as citation to relevant depositions or answers to interrogatories is required.").

Justice White, whose joinder in the Court's opinion in *Celotex* was necessary to obtain the five Justice majority, wrote a concurring opinion. *Celotex*, 106 S.Ct. at 2555–2556 (White, J. concurring). Justice White attempted to either clarify or modify the Court's opinion when he wrote in concurrence:

> I agree that the Court of Appeals was wrong in holding that the moving defendant must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact. I also agree that the movant may rely upon depositions, answers to interrogatories and the like to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute. But the movant must discharge the burden the rules place upon him: It is not enough to move for summary judgment without support-

ing the motion in any way or with a conclusionary assertion that the plaintiff has no evidence to prove his case.

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery rules or by court order. Of course, he must respond if required to do so; *but he need not depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case.* It is defendant's task to negate, if he can, the claimed basis of the suit.

*Petitioner Celotex does not dispute that if respondant has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact.* * * * Because the Court of Appeals found it unnecessary to address this aspect of the case, I agree that the case should be remanded for further proceedings.

*Celotex*, 106 S.Ct. at 2555–2556 (White, B. concurring); *See also id.* at 2557—2559 (Brennan, J., with whom Burger, W., and Blackum, H., join, dissenting) ("Plainly, a conclusionary assertion that the nonmoving party has no evidence is insufficient.... Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. * * * I do not read the Court's opinion to say anything inconsistant with or different than the preceeding analysis. My disagreement with the Court concerns the application of these principles to the facts of this case.").

The weight of post-*Celotex* authority finds Justice White's concurring opinion to be persuasive, if not controlling. In *Fano v. O'Neill*, 806 F.2d 1262 (5th Cir.1987), the District Court granted the government defendant's motion for summary judgment on the ground that the plaintiff had failed to produce any evidence in support of his allegations. *Fano*, 806 F.2d at 1263, 1266. The Court of Appeals, relying on Justice White's concurring opinion in *Celotex*, reversed because "[t]he government ha[d] done nothing more ... than to say [plaintiff] ... lacks evidence to prove the claim", and had therefore failed to discharge its initial burden of production. *Fano*, 806 F.2d at 1266.

Similarly, in *Ditkof v. Owens—Illinois, Inc.*, 114 F.R.D. 104 (East.Dist.Mich.1987), a wrongful death action, the defendants moved for summary judgment on the ground that the plaintiff had no evidence linking a particular asbestos product or manufacturer with the decedent's injuries. *Ditkoff*, 114 F.R.D. at 106. The plaintiff had identified a witness who would testify on said issue and defendants had failed to depose him. *Id.* The Court noted that Justice White provided the majority's fifth vote in *Celotex*. *Ditkoff*, 114 F.R.D. at 106 n. 6. The Court, relying upon Justice White's concurring opinion in *Celotex*, denied the motion. *Ditkoff*, 114 F.R.D. at 104; *see also: Celotex*, 106 S.Ct. at 2556 n. 1 (Brennan, W., with whom Burger, W., and Blackmun, H., join, dissenting) ("Absent some clearer expression from the Court to the contrary, Justice White's understanding would seem to be controlling. *Cf. Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)."); *Windon Oil and Gas Drilling Partnership v. Federal Deposit Insurance Corporation*, 805 F.2d 342, 345 n. 7 (10th Cir.1986) ("[C]onclusionary assertions to aver the absence of evidence remain insufficient to meet this burden. Otherwise, as Justice Brennan cautioned, summary judgment '[would] be converted into a tool for harassment.'"); *Bostwick-Braun Company v. Szews*, 645 F.Supp. 221, 226 (West. Dist.Wis.1986) (Court relies upon Jusitice White's concurring opinion in *Celotex* for the proposition that "[t]he lack of evidence on this issue does not entitle defendants to summary judgment by the simple expedient of a conclusionary assertion that the plaintiff has no evidence to prove his

case."); *Brooks v. Raymark Industries, Inc.* (East.Dist.Penn.1986) [Available on WESTLAW, DCT database] (Wrongful death action. Defendant filed unopposed motion for summary judgment on the ground that plaintiff lacked evidence which would connect defendant's products with those the decedent used. Plaintiff failed to answer defendant's interrogatories seeking disclosure of such information. Court denies motion, relying on Jutice White's concurring opinion in *Celotex.*); *Rateree v. Rockett,* —— F.Supp. —— (North.Dist.Ill. 1987) [Available on WESTLAW, DCT database] (LEXIS) (Court grants summary judgment after quoting Justice White's concurring opinion in *Celotex* and finding that "defendants … have satisfied Justice White's suggested higher burden."); *Cf. Pantry Queen Foods v. Lifschultz Fast Freight,* 809 F.2d 451, 456 (7th Cir.1987) (Citing Justice White's concurring opinion in *Celotex* in support of the proposition that "parties are entitled to the strategic advantage of information to which the other side has not sought access."); *Barnes v. Southwest Forrest Industries,* 814 F.2d 607, 609 (11th Cir.1987) (Court refers, without explanation, to "plurality opinion" in *Celotex.*); *Flood v. Lane,* 638 F.Supp. 677, 687, 687 n. 1 (N.D.Ill.1986) (Body of opinion refers to "the *Celotex* majority opinion … and Justice Brennan's more thoughtful parsing of the burdens of production and persuasion under Rule 56…." Note 1: "It is tempting to call Justice Rhenquist's a pluality, rather than a majority, opinion under the odd circumstances of *Celotex.*"); *Mikucki v. United States Postal Service,* 41 F.E.P. Cases 1503 (Dist.Mass.1986) [Available on WESTLAW, DCT database] (Court refers, without explanation, to "plurality opinion" in *Celotex.*).

 This Court finds the above-cited authorities to be both persuasive and of compelling weight. Thus, the Court will deny Defendants' motion for partial summary judgment that Plaintiffs have failed to produce evidence in support of their manufacturing defect theory. Defendants failed to discharge their initial burden of production because they have not deposed Plaintiffs' expert witness and demonstrated that he could not offer any evidence relevant to the existence of the alleged manufacturing defect.

### (ii) PLAINTIFFS' FIVE EVIDENTIARY EXHIBITS.

The Court need not consider whether Plaintiffs' five (5) evidentiary exhibits raise a material issue of fact in order to render a decision on defendants' motion for partial summary judgment on the ground under consideration because defendants failed to discharge their initial burden of production. *See: Celotex,* 106 S.Ct. at 2558 (Brennan, W., with whom Burger, W., and Blackum, H., join, dissenting) ("If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion."). Moreover, there would be little, if any utility, in doing so. Even assuming, *arguendo,* that the Court now determined that said exhibits do not alone create a material issue of fact, said determinations would serve no useful purpose. Plaintiffs' contend that their expert witness can and will offer evidence relevant to the manufacturing defect issue. The evidentiary value of plaintiffs' exhibits and the permissalbe inferences therefrom can be properly judged only in light of the expert's testimony, and vice versa. *See:* F.R.E. 104(b) (Relevancy conditioned on fact.); 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* para. 56.15[3], pg. 56–469 (2nd ed. 1948) (All inferences must be drawn in favor of the nonmoving party.). This is not a situation where it is practicable for the Court to ascertain what material facts regarding plaintiffs' manufacturing defect theory exist without substantial controversy and what material facts are actually and in good faith controverted. *See:* Fed.R. Civ.P. 56(d); *See also:* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* section 2737, pgs. 460–461 (2nd ed. 1983). Thus, the Court declines to analyze plaintiffs' exhibits at this time.

## B. EXPRESS AND IMPLIED WARRANTY THEORIES.

Defendants failed to recognize the clear distinction between plaintiffs' express and implied warranty theories of recovery. Said theories are analyzed separately below.

### 1. EXPRESS WARRANTY THEORY.

Defendants' motion for partial summary judgment on plaintiffs' second cause of action for breach of ·express warranty requests that the Court either: (a) dismiss said cause of action; or (b) hold that said cause of action is subject to this Court's Order entered on September 20, 1985, that Restatement (Second) of Torts, section 402A comment k applies to this action.

Defendants have neither submitted evidence on plaintiffs' express warranty claim, nor have they expressly alleged that plaintiffs have no· evidence to support said claim. Moreover, defendants failed to discharge their initial burden of production under *Celotex*, discussed in section II.A. 2.(d), *supra*, to discover the evidentiary basis of plaintiffs' case and demonstrate that plaintiffs have no evidence to support said claim. Thus, defendants' motion for partial summary judgment on plaintiffs' express warranty claim is made solely on the basis of the pleadings and is therefore functionally equivilant to a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c). *See:* 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice*, para. 56.11[2], pg. 56–210 (2d ed. 1948). The motion must be denied if and only if, as against the moving parties: (i) plaintiffs have a viable legal theory on the claim asserted; and (ii) the pleadings raise any issue of material fact. *See: Id.* at pgs. 56–210 to 56–211.

#### a. MOTION TO DISMISS.

Defendants initially contend that plaintiffs' claim for breach of express warranty is merely duplicative of plaintiffs' strict liability "failure to warn" theory. Said contention is incorrect.

In *Grinnell v. Charles Pfizer & Company*, 274 Cal.App.2d 424, 79 Cal.Rptr. 369 (1969), the defendant manufacturer made an affirmation of fact that there were no known contraindications to the use of a polio vaccine. *Grinnell*, 79 Cal.Rptr. at 377–378. However, shortly before the drug was distributed with said representation, the Surgeon General determined that there were in fact contraindications to its use. *Grinnell*, 79 Cal.Rptr. at 379. On appeal, the Court held that:

> It is immaterial whether defendant had actual knowledge of the contraindications. "The obligation of a warranty is absolute, and is imposed as a matter of law irrespective. of whether the seller knew or should have known of the falsity of his representations."

*Grinnell*, 79 Cal.Rptr. at 379 (citations omitted). The Court affirmed the judgment for the plaintiff on his claim for breach of express warranty. *Grinnell*, 79 Cal.Rptr. at 381.

In contrast, a plaintiff cannot recover on a strict liability "failure to warn" claim if the defendant "failed" to warn the plaintiff regarding a danger the defendant neither knew nor reasonably should have known about. *See, e.g.: Lee v. Butcher Boy*, 169 Cal.App.3d 375, 387–388, 215 Cal. Rptr. 195, 201 (1985), *review denied* (1985); *Blackwell v. Phelps Dodge Corp.*, 157 Cal. App.3d 372, 377, 203 Cal.Rptr. 706, 710 (1984); *Groll v. Shell Oil Co.*, 148 Cal. App.3d 444, 448, 196 Cal.Rptr. 52, 54. (1983). Thus, it is clear that Plaintiffs claim for breach of express warranty under *Grinnell* would entitle Plaintiffs to recover damages under facts where they could not recover on their strict liability "failure to warn" claim.

Defendants also contend that plaintiffs breach of express warranty claim is *necessarily* inconsistent with *Sindell* market share liability because a cause of action for breach of express warranty normally depends upon proof that the injured party relied upon the representations of a specifically identified manufacturer. Said contention is unpersuasive.

During oral argument on the pending motions, plaintiffs' counsel indicated that: (i) the relevant affirmations of fact

were set forth on package inserts accompanying all of the D.P.T. products of all of the Defendants; and (ii) all of the defendants' affirmations of fact were idenitcal in all material respects. This Court can perceive no reason why, given existing caselaw, plaintiffs cannot proceed with their claim for breach of express warranty on the market share liability theory under such facts.

■ The essential ingredients of an express warranty are: (a) an affirmation of fact by the seller with respect to the item sold; and (b) reliance on such affirmation by the purchaser of the thing sold. *Grinnell*, 79 Cal.Rptr. at 378.[11] Assuming, *arguendo*, that Plaintiffs' allegations are true, then defendants' affirmations of fact are, like the inherently defective DES in *Sindell* and unlike the individually defective product in *Sheffield*, fungible.

■ Plaintiffs can recover on their claim for breach of express warranty against a given defendant on a *Sindell* market share liability theory if and only if: (a) plaintiffs establish that (i) they have joined as defendants the manufacturers of a substantial share of the D.P.T. market, (ii) the purchaser of the D.P.T. relied on an affirmation of fact with respect to same, (iii) such affirmation of fact was false; (iv) the given defendant marketed D.P.T. coupled with such affirmation of fact, and (v) plaintiffs cannot, through no fault of their own, identify the manufacturer which produced the D.P.T. administered to plaintiff David Morris and which made the affirmation of fact upon which the purchaser of said D.P.T. relied; *and* (b) the given defendant fails to establish that it could not have produced the D.P.T. that was administered to plaintiff David Morris.

Said test is consistant with the holdings and rationales of both *Sindell* and *Sheffield*. As in *Sindell*, plaintiffs bear the initial burden of establishing all of the elements of the underlying claim against a given defendant except for causation, as to which the burden is shifted to the latter. *See: Murphy*, 40 Cal.3d at 683–684, 221 Cal.Rptr. at 454–455, 710 P.2d at 254–55; *Sindell*, 26 Cal.3d at 611–613, 163 Cal.Rptr. at 144–145, 607 P.2d at 936–37. Thus, plaintiffs will bear the burden of proving that the D.P.T. manufactured by a given defendant had the same "defect" (in this case distribution in conjunjuction with a false afffirmation of fact with respect to the D.P.T.) as that which caused plaintiff David Morris' injuries. *See: Id.* Additionally, plaintiffs must initially establish that the given defendants' D.P.T. "might have been administered" to plaintiff David Morris as a result of the purchaser's reliance upon the false affirmation of fact with which such D.P.T. was marketed. *See: Id.* Unlike *Sheffield*, once plaintiffs establish their *prima facie* case against a given defendant, they will have established that said defendant acted tortiously (i.e., by making false affirmations of fact with respect to its product in conjunction with the marketing of same). *See: Pena*, 179 Cal. App.3d at 929, 225 Cal.Rptr. at 79; *Sheffield*, 144 Cal.App.3d at 595–596, 192 Cal. Rptr. at 877–878.

■ Finally the Court notes that the justification for placing the burden of proof regarding actual causation upon a defendant manufacturer is more compelling where, as (presumably) here, it voluntarily made an affirmation of fact with respect to its product, and thus consciously accepted the reponsibility for the accuracy of said affirmation, than where, as in *Sindell* it is held liable on a theory of strict liability.[12]

11. California has adopted the "learned intermediary" rule that as to prescription drugs, a manufacturer's duty to warn runs to the prescribing physician and not to the ultimate consumer. *See: Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973). The prescribing physician will be referred to as "the purchaser."

12. Defendants have brought the decision in *Brown v. Superior Court (Abbott Laboratories)*,

192 Cal.App.3d 150, 227 Cal.Rptr. 768 (Cal.App. 1 Dist.1986), *review granted*, 229 Cal.Rptr. 663 (Cal.1986), discussed at note 1, *supra*, to the attention of the Court and properly noted that said decision was not officially published. *See:* Cal.R.Ct. 976(d).

Thus, the decision in *Brown* does not have formal precedential effect and is not binding on this Court. *See also:* 1A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice*, para.

**b. APPLICABILITY OF RESTATE-MENT (SECOND) OF TORTS, SECTION 402A COMMENT K.**

Defendants' argument that Restatement (Second) of Torts, section 402A comment k applies to plaintiffs' breach of express warranty claim is obviously specious for two (2) reasons. First, comment k modifies the strict products liability rule set forth in section 402A. Comment k simply does not address the situation where a a plaintiff seeks to hold a manufacturer liable for the latter's voluntary express affirmations of fact with respect to its product. Secondly, even assuming, *arguendo*, that comment k did apply to such a claim, comment k specifically provides that the seller of an unavoidably unsafe product should not be held liable "with the qualification that [the product is] properly ... marketed, and [the] proper warning is given." *See:* Restatement (Second) of Torts, section 402A comment k (emphasis added). A manufacturer that makes a false affirmation of fact with respect to the safety of its product has neither marketed the product properly nor given adequate warning of the product's dangerous characteristics. Such a product is, by definition, not *"unavoidably* unsafe."

**2. IMPLIED WARRANTY THEORY.**

Plaintiffs correctly contend that *Magee v. Wyeth Laboratories, Inc.,* 214 Cal.App.2d 340, 29 Cal.Rptr. 322 (1953), stands for the proposition that the *implied warranty* of a drug when sold is that it is fit for the contemplated use by the class of persons for whom it has been prepared and in the manner indicated by the manufacturer. Plaintiffs further contend this rule has not been modified by the subsequent California cases in the area of *strict products liability* that have applied comment k to foreclose strict design defect liability for unavoidably unsafe drugs. Plaintiffs' unspoken premise is that there is a meaningful distinction between the "implied warranty" and the "strict liability" theories of recovery in the area of consumer goods.

Defendants contend that plaintiffs' implied warranty theory of recovery can serve no *legitimate* purpose since it is al-

---

0.309[1], pgs. 3112–3113 (2d ed. 1938) (A federal court should not blindly adhere to the decision of a state intermediate appellate court when ascertaining state law.) 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* section 4507, pg. 95 (1982) (same).

*Brown* recognized that it would be possible to apply the *Sindell* market share laibility theory to an expres warranty claim. *Brown,* 227 Cal. Rptr. at 777. However, the court declined to do so because it believed that, while it was "theoretically possible" for a plaintiff to prove that all of the defendant manufacturers made the same representations, the "practical remoteness" of said possibility counseled against "confusing the market share lawsuits with such proof." *Id.* *Brown* did not cite any authority in support of the limitation it placed upon the application of the market share liability theory. Moreover, said limitation does not arise from, and appears to be inconsistent with, the reasoning in *Sindell.* The decision in *Sindell* placed great faith in the ability of juries to deal with complex evidentiary issues. *See: Sindell,* 26 Cal.3d at 612–613, 163 Cal.Rptr. at 145, 607 P.2d at 937 ("It is probably impossible ... to determine market share with mathematical exactitude. But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault ... the difficulty of apportioning damages among the defendant producers in exact rela-

tion to their market share does not seriously militate against the rule we adopt.").

Finally, the *Brown* court's assumption that the possibility of the defendant manufacturers making the same representations was "practically remote" is at least partially belied by the fact that such allegations were present in *Sindell. See: Sindell,* 26 Cal.3d at 594, 163 Cal.Rptr. at 134, 607 P.2d at 926. (Allegation that the "defendants" advertised that DES was safe and effective to prevent miscarriage....."). It appears to this Court that given the generality of the factual representations and opinions that will support a judgment on an express warrant claim, it is not at all unlikely that the manufacturers of a given generic drug would make the same representations with respect to the drug. *See, e.g., Grinnell,* 79 Cal.Rptr. at 377 (Affirming judgment an express warranty claim against single defendant manufacturer based on representation that "[t]here are no known contraindications to oral polio vaccines."); *see also: Grinnell,* 79 Cal.Rptr. at 378 (Statement of opinion, as opposed to fact, will suffice where seller has superior knowledge and purchaser reasonably relies upon same.).

Thus, the Court declines to follow the decision in *Brown* at this time. The Court of course recognizes that this issue is now before the California Supreme Court and trusts that the parties will keep it duly informed.

legedly duplicative of plaintiffs' strict liability claims. Defendants further contend that said theory would not allow plaintiffs to recover damages under any set of facts where they would not be entitled to recovery on their strict liability claims. Defendants conclude by asserting that plaintiffs' implied warranty claim is subject to this Court's Order entered on September 20, 1985, finding that comment k applies to this case. Defendants unspoken premis is that *Magee* was overruled *sub silentio* by the later California cases which applied comment k. *See, e.g.: Carmichael v. Reitz,* 17 Cal.App.3d 958, 988–989, 95 Cal. Rptr. 381, 400 (1971); *Christofferson v. Kaiser Foundation Hospitals,* 15 Cal. App.3d 75, 77–80, 92 Cal.Rptr. 825, 826–827 (1971).

In actions involving personal injuries resulting from defective products made or sold by a defendant, the theory of strict liability in tort has largely superseded implied warranty liability. *Hilliard v. A.H. Robins Co.,* 148 Cal.App.3d 374, 395 n. 19, 196 Cal.Rptr. 117, 130 n. 19 (1983); *Shepard v. Alexian Brothers Hospital, Inc.,* 33 Cal.App.3d 606, 614, 109 Cal.Rptr. 132, 137 (1973); *Grinnell,* 79 Cal.Rptr. at 373. California appellate courts usually ignore the breach of warranty claim where product liability is shown. *Hilliard,* 148 Cal. App.3d at 295 n. 19, 196 Cal.Rptr. at 130 n. 19. In California the doctrine of strict liability is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitations through inconsistancies with express warranties. *Shepard,* 33 Cal.App.3d at 614–615, 109 Cal.Rptr. at 137.

The Court's analysis of this issue is guided by the reasoning in *Shepard.* In *Shepard* the Court initially held that the doctrine of strict liability in tort was inapplicable as a matter of law to blood transfusions. *Shepard,* 33 Cal.App.3d at 613–614, 109 Cal.Rptr. at 136. However, the plaintiff appellant also asserted a cause of action for breach of implied warranty. *Shepard,* 33 Cal.App.3d at 614, 109 Cal.Rptr. at 137. After discussing the relationship between the strict liability and implied warranty theories of recovery, the Court concluded:

> Since ... the liability imposed by strict liability in tort and breach of ... implied warranties is virtually the same, i.e., a form of liability without fault, the conclusion reached in the earlier discussion is equally applicable here.

*Shepard,* 33 Cal.App.3d at 615, 109 Cal. Rptr. at 137; *See also: Christofferson,* 15 Cal.App.3d at 80, 92 Cal.Rptr. at 828 ("Plaintiff also asserts that the issue of implied warranty ... should have been submitted [to the jury]. But the doctrine has been largely superseded. That theory ... would aid plaintiff only if it required warning of all dangers.... This issue we have resulted (sic) against her [on her strict liability claim]."). The *Shepard* Court went on to hold that the defendant could not be held liable for the blood transfusion on a breach of implied warranty theory. *Shepard,* 33 Cal.App.3d at 614–615, 109 Cal. Rptr. at 137.

■ Thus, this Court concludes that plaintiffs' claim for breach of implied warranty is subject to the Court's previous Order finding that comment k applies to this action and that plaintiffs are foreclosed from proceeding on a design defect theory. The Court is tempted to grant defendants' request that it dismiss said claim because: (i) it appears to be entirely duplicative of plaintiffs' strict liability claims; and (ii) its only function appears to be to confuse the legal and factual issues, and potentially the jury. However, the Court will refrain from doing so at this time without prejudice to its reconsideration of this matter prior to trial. The Court is adopting this approach for two reasons. First, defendants have failed to cite any authority in support of the proposition that the Court may dismiss plaintiffs' implied warranty claim. Secondly, while the California Courts have recognized that the implied warranty theory has been *"largely* superseded", and is *"usually* ignored" on appeal, this Court has been unable to find any authority for the proposition that the implied warranty theory has been *completely* replaced by the theory of strict products

liability and no longer serves a useful purpose. It would be highly inappropriate for this Court to be the first one to make such a ruling.

### III. ORDER

For the reasons stated above, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

A. The policy articulated in Restatement (Second) of Torts, section 402A comment k applies to plaintiffs' claim for breach of implied warranty, and plaintiffs are foreclosed from proceeding on said claim on a design defect theory pursuant to this Court's Order entered on September 20, 1985;

B. Defendants' motions for partial summary judgment are DENIED in all other respects; and

C. Plaintiffs' claims are not preempted by federal law.